UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD MAX STRAHAN,           )
        Plaintiff,             )
                              )
        v.                    )   C.A. No. 08-cv-10919-MLW
                              )
                              )
ADM. GARY ROUGHEAD, et al,     )
        Defendants.            )

MEMORANDUM AND ORDER

WOLF, D.J.                                    November 22, 2010

I.  INTRODUCTION

     This case involves the Navy's obligations to protect certain

federally-protected whale species (the "Federally Protected

Whales")[1] under the Endangered Species Act (the "ESA"), 16 U.S.C.

§1531 et seq.  Plaintiff Richard Max Strahan ("Strahan") filed

the complaint in this action pro se,[2] seeking declaratory and

injunctive relief against the defendants, Admiral Gary Roughead

and Secretary Raymond E. Mabus[3] of the United States Navy, and

_____

[1]The four federally-protected species are the Northern Right
Whale (Eubalaena glacialis), the Humpback Whale (Megaptera
novaenagliae), the Fin Whale (Balaenoptera physalus), and the
Blue Whale (Balaenoptera musculus). Complaint at 2.

[2]This case was stayed while Strahan unsuccessfully sought to
obtain counsel to represent him.  If, by December 7, 2010,
Strahan requests counsel, the court will attempt to find an
attorney who will represent him pro bono in this complex matter.

[3]Mabus is substituted for his predecessor, Donald C. Winter,
pursuant to Federal Rule of Civil Procedure 25(d).

Robert M. Gates, the Secretary of the United States Department of Defense (collectively "the Navy").  Essentially, Strahan contends that by operating Navy vessels and conducting military training operations in United States coastal waters in a manner that kills and injures four federally protected whales species and adversely alters their federally-designated habitats, and by failing to consult with the National Marine Fisheries Service (the "NMFS") regarding the impact of its operations, the Navy is violating various provisions of the ESA.

The Navy moves for dismissal for lack of subject matter jurisdiction.  Strahan moves for a preliminary injunction, as well as for orders compelling the Navy to comply with his requests for jurisdictional discovery, to lift the stay that currently exists, to compel the Navy to send him e-mail filings, and to schedule a conference.  For the reasons described below, the stay in this case is being lifted; the Navy's motion to dismiss for lack of subject matter jurisdiction is being denied, without prejudice to renewal with regard to the question of mootness following further submissions and, if necessary, a hearing on the issue; Strahan's motion to compel jurisdictional discovery is being allowed in part and denied in part, also without prejudice to renewal should the Navy again move to dismiss on jurisdictional grounds; Strahan's motion for a

preliminary injunction is being denied; and Strahan's motion to compel e-mail filings is being denied.   Strahan's motions to schedule a conference are being allowed.


II.  FACTUAL AND STATUTORY BACKGROUND

   A.  <u>Factual Background</u>

   To the extent that the Navy has presented a facial challenge to the court's subject matter jurisdiction, the court must rely on the facts alleged in the complaint.  <u>See</u> <u>Torres-Negron v. J &amp; N Records, LLC</u>, 504 F.3d 151, 162 (1st Cir. 2007).  To the extent that the Navy has presented a factual challenge, the court must decide if material facts are in dispute.  <u>Id.</u>  Except where otherwise indicated, the following facts are derived from Strahan's complaint.

   Strahan, a conservation biologist and the Chief Science Officer of Whale Safe USA, an "environmental movement that seeks to implement conservation plans for endangered species of wildlife," is "an avid whale watcher in the New England area" who lives most of the year in Boston, Massachusetts, with a business address in San Francisco, California.  Complaint at 4-5.  In his Complaint, Strahan alleges that the Navy, through the operation of its vessels and the deployment of explosive and non-explosive ordnance during training operations, routinely causes harm to

Federally Protected Whales, each of which is a "resident species of the U.S. coastline,"[4] and to their federally-designated habitats, thereby "imped[ing] their critical life activities." Complaint at 7, 11-12.

Strahan particularly emphasizes the harm to Northern Right Whales, "the most endangered species of whale in the world," which has "been in continuous decline for at least the last three decades." Complaint at 6. The principal way in which humans contribute to Northern Right Whale mortality is through "ship strikes and entanglement in commercial fishing gear." Id. Consequently, the remaining population of the Northern Right Whale in the Atlantic Ocean is in the low 200s. Complaint at 7.

In support of his allegations regarding the harm that Naval operations cause to Federally Protected Whales, Strahan notes several instances in which the Navy has allegedly killed whales:

1. Five dead Northern Right Whales were discovered off the coast of Florida in January and February, 1996, "just outside of the area that the Navy concurrently conducting [sic] military training exercises with live ordinance [sic]." Complaint at 9. This area bordered and included area listed pursuant to the ESA as critical habitat for the Northern Right Whale. The whales had

---

[4]Strahan notes that "[m]ost coastal states list Federally Protected Whales as 'resident species' under their state environmental protection statutes and regulations." Complaint at 7.

injuries caused by being in the vicinity of detonating explosives. Id.

2. On June 10, 2002, the NMFS discovered the "headless carcass" of a Northern Right Whale calf "just to the north" of the area designated as the Northern Right Whale's critical habitat. Id. The Navy had been conducting bombing exercises approximately 60 miles northeast of Cape Cod, Massachusetts and 50 miles north of the whales' critical habitat. Id.

3. On November 17, 2004, the Navy ship U.S.S. Iwo Jima allegedly struck and killed a pregnant Northern Right Whale ten miles outside the entrance to the Chesapeake Bay off the Delaware coastline. Id. at 8. The Navy did not report the whale's death until November 24, 2005, when the whale carcass washed up in North Carolina. Id. A necropsy confirmed that the whale had been pregnant and that it had been killed by ship strike. Id.

4. In 2005, a Navy training operation resulted in the death of a Northern Right Whale off of Monomoy Island in Massachusetts. Id. at 3.

By causing such deaths, Strahan alleges, the Navy "has destroyed the ability of the Northern Right Whale to recover from its endangered status on its own." Id. at 9. He notes that the NMFS has already determined, after consultation with the U.S. Coast Guard, that "a single killing or serious injuring of any

5

Northern Right Whale would jeopardize the continued survival of this species." <u>Id.</u>

Strahan asserts that despite the danger that its operations pose to the survival of the Northern Right Whale and the other Federally Protected Whales mentioned in the Complaint, the Navy has not developed a conservation plan to prevent harm to Federally Protected Whales; has not entered into any ESA consultation with NMFS on this issue; and has not obtained an "incidental take" statement from NMFS authorizing incidental, but not purposeful, Whale "takings." <u>Id.</u> at 10, 13-14. Strahan further alleges that the NMFS has never reviewed the impact of Naval operations on Federally Protected Whales, nor has it directed the Navy to enter into ESA consultation regarding this impact. <u>Id.</u> at 7-8, 10.

B. <u>Statutory Framework</u>

1. <u>Section 7 of the ESA</u>

Section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), "directs federal agencies to insure that agency action is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." <u>Water Keeper Alliance v. United States Dep't of Defense</u>, 271 F.3d 21, 25 (1st Cir. 2001) (internal quotation marks omitted). "This substantive

requirement is backed up by a scheme of procedural requirements that set up a consultation process between the agency (in this case the Navy) and the [NMFS]... to determine whether endangered species or critical habitat are jeopardized by the proposed agency action and whether this adverse impact may be avoided or minimized." Id.; see ESA §7; 16 U.S.C. §1536.

To determine the possible effects of its actions, the agency (the Navy) may consult with the relevant Service (the NMFS) through informal consultation, a term that "simply describes discussions and correspondence between the [NMFS] and the agency designed to assist the agency in determining whether its proposed action is likely to impact listed species or critical habitat." Id.; see 50 C.F.R. §402.13. "If, at the conclusion of the informal consultation, the [NMFS] issue[s] [a] written concurrence[] that a proposed action is not likely to adversely affect any listed species or critical habitat, the agency may proceed with the action without further consultation...." Id. (internal quotation marks omitted); see 50 C.F.R. §402.14(b)(1).

However, where the informal consultation does not resolve the issue, the agency must embark on formal consultation. See id. at 26. "[F]ormal consultation culminates in the [NMFS's] issuance of [a] biological opinion[] advising the agency 'whether the action is likely to jeopardize the continued existence of a

listed species or result in the destruction or adverse modification of critical habitat,' and if so, whether 'reasonable and prudent alternatives' exist to allow the agency to comply with the ESA."  <u>Id.</u> (quoting 50 C.F.R. §402.14(h)).  "If the [NMFS] conclude[s] that the action, or the implementation of any reasonable and prudent alternatives, comply with the ESA, the [NMFS] must also issue an 'incidental take statement' that specifies the amount or extent of the authorized taking of the species."  <u>Id.</u> (quoting ESA §7(b)(4)).

     2.  <u>Section 9 of the ESA</u>

The ESA prohibits any person, a term that includes "any officer, employee, agent, department, or instrumentality of the Federal Government," from "taking" a listed species.  ESA §§3(13) and 9(a)(1); 16 U.S.C. §§1532(13) and 1538(a)(1)(B).  The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  ESA §3(19); 16 U.S.C. §1532 (19).  "'Take' is defined...in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' fish or wildlife."  S. Rep. No. 93-307, at 7 (1973); <u>see also</u> <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687, 703-04 (1995) (citing Congressional reports demonstrating that take is to be defined broadly); <u>Strahan v.</u>

Coxe, 127 F.3d 155, 162 (1st Cir. 1997).  "'Harass' is further defined by regulations as an intentional or negligent act or omission that significantly disrupts normal behavior patterns of the endangered animal." Palila v. Hawaii Dept. of Land and Natural Resources, 639 F.2d 495, 497 (9th Cir. 1981); see 50 C.F.R. §17.3(c).  "Similarly, 'harm' is defined to include activity that results in significant environmental modification or degradation of the endangered animal's habitat." Id.; see 50 C.F.R. §17.3(c).

If, after Section 7 formal consultation, the NMFS concludes that any taking of a listed species incidental to the agency action will not violate the ESA, it is required to provide the agency with a written statement specifying the impact of the incidental taking and the "reasonable and prudent measures...necessary or appropriate to minimize such impact." 16 U.S.C. §1536(b)(4).  A taking that is in compliance with the terms and conditions so specified "shall not be considered to be a prohibited taking of the species concerned." Id. at §1536(o)(2).  In addition, the NMFS may permit a taking that is incidental to the carrying out of an otherwise lawful activity. Id. at §1539(a).

   3. Citizen Suits Under the ESA

The ESA authorizes citizen enforcement suits allowing any

person to file a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency...who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof...." 16 U.S.C. §1540(g)(1)(A). Although such a suit can challenge actions by regulated entities such as the Navy, it cannot be based on an alleged failure of the Secretary of the Interior or the Secretary of Commerce "to perform his duties as administrator of the ESA." Bennett v. Spear, 520 U.S. 154, 173 (1997).

Because the ESA's citizen suit provision does not specify a standard of review for the merits of a claim, circuit courts often look to the standards contained in the APA, as stated in the portions of the APA governing what the agency has done, or failed to do. See Water Keeper Alliance, 271 F.3d at 31 (listing cases); Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1106 n.3 (10th Cir. 2010) ("The APA governs judicial review of agency action challenged through the ESA citizen-suit provision."). Generally, courts review challenges to agency action under the "arbitrary and capricious" standard of §706(2)(A) of the APA. See, e.g., Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 685-86 (D.C. Cir. 1982) (evaluating the Forest Service's decision to approve a drilling project in an area populated by grizzly bears, a threatened species under the

ESA, under the arbitrary and capricious standard).

III. DISCUSSION

As indicated earlier, there are several pending motions in this case. For the reasons explained below, the court is lifting the stay of this case, ordering updated submissions concerning whether this case should be dismissed as moot and, if not, scheduling a Federal Rule of Civil Procedure 16(b) conference, as requested by Strahan. The court is denying, without prejudice, the Navy's motion to dismiss for lack of subject matter jurisdiction and granting Strahan's motion for jurisdictional discovery in part. The court is denying Strahan's motions for a preliminary injunction and to order the defendants to send him email filings.

A. Preliminary Matters

1. Lifting the Stay

On June 20, 2009, the court stayed this case to permit Strahan to be represented by counsel. This stay was issued in response to Strahan's assertion that he had found counsel to represent him starting in September, 2009, and that if the representation proceeded as planned, he would move either to change venue or to dismiss this action without prejudice. See June 20, 2009 Order.

Strahan subsequently informed the court that he would not be represented by counsel, but would instead continue to prosecute his case pro se.  He also stated that he would not be seeking a change of venue.

Accordingly, the stay of this case is being lifted.


2.  Email Filings

Strahan asserts that he regularly has difficulty accessing documents through ECF.  However, Strahan has been granted access to ECF, and he receives an electronic Notice of Electronic Filing ("NEF") each time a submission is uploaded on the system.  This constitutes service of the filed document under Rule 5.4(C) of the Local Rules of the United States District Court of Massachusetts.  Therefore, this motion is being denied.  Strahan should address any technical difficulty he has in accessing ECF with the ECF Help Desk, at 866-239-6233 or ecfhelp@mad.uscourts.gov.  In addition, as noted on the ECF log-in page, Strahan can seek assistance from the PACER Service Center, 800-676-6856.

B.  Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(B)(1)

1.  Programmatic Challenge

Defendants argue that the Complaint is an improper

programmatic challenge to the "ship operations" of the Navy, and in the alternative, that Strahan's effort to compel Section 7 consultation should be dismissed as moot because the Navy has engaged in such consultation with the NMFS.[5]

In opposition, Strahan argues that the prohibition against "programmatic challenges" does not apply to actions under the ESA's citizen suit provision, and that Count III should not be

---

[5]In addition to these two primary arguments, the Navy cursorily suggests two other bases on which its motion to dismiss should be granted. First, the Navy states, without argumentation or legal citation, that "Count 2 should be dismissed for failure to state a claim," because "Count 2 asserts the Navy is 'taking' critical habitat" but "the ESA only prohibits taking of species, not of habitat." Motion to Dismiss Memo at 2. The Navy repeats this argument in a footnote, citing 16 U.S.C. §1538(a)(1) in support of its assertion that the "there can be no 'take' of critical habitat." Id. at 14 n. 7.

Second, again in a footnote, the Navy asserts that "Plaintiff has not alleged that he has standing to challenge any Naval operations outside the waters of Massachusetts," and thus, "if the Court allows the action to continue, this Court should dismiss Plaintiff's claims insofar as they relate to activities outside Massachusetts waters." Id. at 7 n.3. The Navy cites two previous suits filed by Strahan in support of its contention.

These passing references are inadequate to present these alternative arguments. As the First Circuit has repeatedly held, "arguments raised only in a footnote or in a perfunctory manner are waived." See Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 61 n. 17 (1st Cir. 1999) (collecting cases), aff'd sub nom., Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000); see also Coopersmith v. Lehman Bros., Inc., 344 F. Supp. 2d 783, 790 n. 5 (D. Mass. 2004). The court is, therefore, not addressing these arguments in this Memorandum and Order. However, the court is not prohibiting the Navy from raising these contentions in subsequent, timely submissions, with additional argumentation and legal support, if the Navy chooses to do so.

13

dismissed as moot because, among other reasons, the scope of the Navy's consultation is inadequate.

"The proponent of federal jurisdiction bears the burden of proving its existence by a preponderance of the evidence." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009). A facial challenge to a court's subject matter jurisdiction requires the court to determine only "if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in the plaintiff's complaint are taken as true for purposes of the motion." Torres-Negron, 504 F.3d at 162 (internal quotation marks and brackets omitted). However, "[w]here [the factual averments] are illuminated, supplemented, or even contradicted by other material in the district court record," the court "need not confine [its] jurisdictional inquiry to the pleadings, but may consider those other materials." Aquilar v. United States Immigration and Customs Enforcement Div. of Dep't. of Homeland Security, 510 F.3d 1, 8 (1st Cir. 2007).

Deciding the Navy's motion to dismiss requires the court to resolve whether Strahan's complaint falls within the parameters permitted under the citizen suit provision of the ESA, 16 U.S.C. §1540(g)(1)(A). Suits brought pursuant to §1540(g)(1)(A) must challenge an "agency action," a term that has been "broadly

defined as encompassing 'all activities or programs of any kind authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.'" Turtle Island Restoration Network v. National Marine Fisheries Service, 340 F.3d 969, 974 (9th Cir. 2003) ("Turtle Island") (quoting Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998) ("Houston")). The ESA implementing regulations list examples of agency actions that include "actions directly or indirectly causing modifications to land, water, or air." 50 C.F.R. §402.02.

For the purpose of the Navy's motion to dismiss, "the APA does not govern [ESA citizen suit] claims." Washington Toxics Coalition v. Environmental Protection Agency, 413 F.3d 1024, 1034 (9th Cir. 2005). Therefore, the APA's "limited provision for judicial review of final agency action" does not control whether Strahan can maintain the claims asserted in the instant action, even though they may not constitute final agency action. Id.; see also Natural Res. Def. Council v. U.S. Dept. of Navy, 2002 WL 32095131 at *22 n. 13 (C.D. Cal. Sept. 17, 2002); Center for Biological Diversity v. U.S. Dept. Of Housing and Urban Development, 241 F.R.D. 495, 503-04 (D. Ariz. 2006).

The Navy argues that even if an action brought under the ESA's citizen suit provision need not be final, it still must

15

allege "some discrete form of agency action" or "some concrete
violation of the ESA."  Motion to Dismiss Memo at 8, 11 (emphasis
in original).  However, the majority of the cases the Navy cites
in support of this contention do not reach this conclusion, but
rather address the requirements of suits brought under the APA.[6]
As indicated earlier, in the separate context of the ESA, in
contrast, "the term 'agency action' has been defined broadly."
Houston, 146 F.3d at 1125; see also Pacific Rivers Council v.
Thomas, 30 F.3d 1050, 1054 (9th Cir. 1994).

It is true that in some cases courts have held that a
challenged action or activity does not constitute "agency action"
under the ESA.  However, these cases are distinguishable from the
instant action.  In Western Watersheds Project v. Matejko, for
example, the Ninth Circuit held that Section 7 of the ESA only

---

[6]Lujan v. National Wildlife Fed'n, Norton v. Southern Utah
Wilderness Alliance ("SUWA"), Foundation on Economic Trends v.
Lynq, Sierra Club v. Peterson, Independent Petroleum Ass'n of Am.
v. Babbitt, and National Wildlife Fed'n v. Brownlee all address
the requirements of suits brought under the APA, rather than
under the ESA's citizen suit provision.  See Lujan, 497 U.S. 871,
871, 891 (1990); SUWA, 542 U.S. 55, 61-63 (2004); Lynq,  943 F.2d
79, 85 (D.C. Cir. 1991); Peterson, 228 F.3d 559, 565 (5th Cir.
2000); Independent Petroleum,  235 F.3d 588, 594 (D.C. Cir.
2001); Brownlee,  402 F. Supp. 1, 7 & n.10 (D.D.C. 2005)
(specifically declining to determine whether the APA's standards
for final agency action apply to suits brought under the ESA).
Conservation Law Found. v. Reilly, which finds that Lujan's
holding that suits brought under the APA must challenge a "final
agency action" does not control a suit not brought under the ESA,
actually undermines the Navy's position.  See Reilly, 950 F.2d
38, 42-43 (1st Cir. 1991).

applies to "affirmative" actions, and that "'inaction is not 'action' for section 7(a)(2) purposes." <u>Western Watersheds Project</u>, 468 F.3d 1099, 1108 (9th Cir. 2006). Because of this, a suit challenging the Bureau of Land Management's ("BLM") failure to regulate water diversions did not constitute affirmative action, because the BLM did not have the authority to regulate the diversions in question. <u>See</u> <u>id.</u> Similarly, in <u>National Ass'n of Home Builders v. Defenders of Wildlife</u>, the Supreme Court held that Section 7's duty to consult "covers only discretionary agency actions and does not attach to actions...that an agency is <u>required</u> by statute to undertake...." <u>National Ass'n of Home Builders</u>, 551 U.S. 644, 669 (2007) (emphasis in original). Here, in contrast, the challenged actions of the Navy are both affirmative and within the Navy's discretion, and therefore constitute "agency action" within the meaning of the ESA.

In <u>Bennett v. Spear</u>, a case that the Navy relies on heavily, the Supreme Court held that a challenge to a Fish and Wildlife Service jeopardy determination regarding the effect of certain activities on an endangered species of fish was not reviewable under §1540(g)(1)(A), part of the ESA citizen suit provision. <u>See</u> <u>Bennett</u>, 520 U.S. at 173-74. The Court explained that suits challenging a "violation" of the ESA under §1540(g)(1)(A) cannot

"include any errors on the part of the Secretary [of the Interior] in administering the ESA." Bennett, 520 U.S. at 174. Reasoning that "the ESA uses the term 'violation' elsewhere in contexts in which it is most unlikely to refer to failure by the Secretary [of the Interior] or other federal officers and employees to perform their duties in administering the ESA," such as in the ESA's civil penalty provision for knowing violators, the Court concluded that §1540(g)(1)(A) did not permit a suit contesting "the Secretary [of the Interior's] maladministration of the ESA." Id.; see also Earth Island Institute v. Albright, 147 F.3d 1352, 1357 (Fed. Cir. 1998); Salmon Spawning & Recovery Alliance v. United States, 626 F. Supp. 2d 1277, 1280 (Ct. Int. Trade 2009).

The instant action is not analogous to Bennett on this point. In contrast to the type of suit prohibited by Bennett, the instant action does not challenge the Secretary of the Interior's administration of the ESA, but rather the alleged violations of the Navy, a regulated agency. Specifically, Strahan alleges that the Navy's operation of "a fleet of just under a thousand vessels" in the Federally Protected Whales' marine habitat "routinely kills, injures, harms, harasses and otherwise unlawfully takes" Federally Protected Whales, alters their habitat, and impedes their life activities, all in

18

violation of the "take" prohibition of Section 9.[7]  Id. at 11-12.

He further alleges that the Navy releases explosive and non-explosive ordnance in or adjacent to the ESA listed critical habitat of the Northern Right Whale, also in violation of the "take" prohibition of Section 9.  Id. at 12-13.  Finally, he alleges that the Navy has failed to consult with NMFS regarding the impact of these ship and military training operations or to otherwise insure that they do not jeopardize the long-term survival of listed whale species and their critical habitats, in violation of Section 7.  Id. at 13-14.

In addition, in view of these specific allegations, Strahan has not, as the Navy contends, presented a "programmatic suit that challenges Naval operations wherever they occur."[8]  Motion

_____

[7]In Plaintiff's First Opposition to Motion to Dismiss, Strahan appears to narrow the geographic scope of this first count.  He states that "[i]n Count I [I] am prosecuting the Navy for striking whales incidental [to] its employees navigating Navy ships along the US Atlantic coastline...."  (emphasis added).  Plaintiff's First Opposition to Motion to Dismiss at 3.

[8]Strahan's complaint is not always as clear as it might be.  However, the court is "obligated to construe a pro se complaint liberally,...drawing all reasonable inferences in the plaintiff's favor." Cooper v. Principi, 71 Fed. Appx. 73 (1st Cir. 2003) (internal citations omitted); see also Haines v. Kerner, 404 U.S. 519, 520 ("allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence").  Therefore, the court construes Strahan's three counts as addressing the specific allegations quoted above.

to Dismiss Memo at 9.   Rather, he challenges specific Naval actions: its deployment of explosive and non-explosive ordnance in federally protected critical habitats, and the manner of its ship operations within or adjacent to federally protected whales and federally protected whale habitats.[9]   Cf. Sierra Club v. Peterson, 228 F.3d 559, 567 (5th Cir. 2000) (barring an APA suit challenging "an entire program by simply identifying specific allegedly-improper final agency actions within that program"). The Navy's alleged failures to comply with the provisions of Sections 7 and 9 of the ESA, if true, are specific violations of the Act within the meaning of §1540(g)(1)(A).   See Center for Biological Diversity, 241 F.R.D. at 503.   Indeed, the exhibits submitted by the Navy demonstrate that it has already engaged in substantial Section 7 consultation with the NMFS regarding its vessel operations on much of the Atlantic coastline, "bel[ying] the [Navy's] argument that [such operations] do not constitute ... agency action." Pacific Rivers Council, 30 F.3d at 1056; see generally, exhibits attached to Motion to Dismiss Memo and Opposition to Motion for Preliminary Injunction.[10]

---

[9]Strahan's prayer for relief suggests he specifically challenges Naval ships operating (1) "in excess of ten knots" in federally protected waters or within 2 miles of a federally protected whale; or (2) within 1000 yards of any federally protected whale. Complaint at 15, ¶V.

[10]Even if this case constitutes a programmatic challenge to Naval operations, it is not clear that such a challenge is barred under

2.   <u>Mootness</u>

Under Article III of the Constitution, federal courts do not have jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." <u>Church of Scientology v. United States</u>, 506 U.S. 9, 12 (1992) (citations omitted).  A case is moot "if the court is not capable of providing any relief which will redress the alleged injury." <u>Gulf of Maine Fisherman's Alliance v. Daley</u>, 292 F.3d 83, 88 (1st Cir. 2002) (citation omitted).  "Thus, 'if an event occurs while a case is pending...that makes it impossible for the court to

---

the ESA, as it is under the APA.  <u>See</u> <u>Center for Biological Diversity</u>, 241 F.R.D. at 504 (holding that under Ninth Circuit law, the APA's prohibition on "broad, programmatic attacks" does not apply to suits brought under the ESA's citizen suit provision); <u>but see</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 568 (Scalia, J.)(noting, in the context of an ESA citizen suit, that in general, "'suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations...[are], even when premised on allegations of several instances of violations of law,...rarely if ever appropriate for federal-court adjudication'") (quoting <u>Allen v. Wright</u>, 468 U.S. 737 (1984)); <u>Western Watersheds Project</u>, 468 F.3d at 1110 (noting that the ESA suit before it was not a programmatic challenge of the type barred by the APA); <u>National Wildlife Foundation v. Caldera</u>, 2002 WL 628649, *3-4 (D.D.C. 2002) (dismissing ESA claims for programmatic relief without explaining why the APA standards also apply to suits brought under the ESA).  The issues of whether a programmatic challenge may be made under the ESA and, if not, whether this case constitutes an impermissible challenge may have to be addressed further if this case continues to a motion for summary judgment and/or trial.

grant any effectual relief whatever to a prevailing party, the [action] must be dismissed.'" Id. (quoting Church of Scientology, 506 U.S. at 12). The party asserting mootness bears a "heavy" burden in attempting to establish its applicability. Manqual v. Rotger-Sabat, 317 F.3d 45, 61 (1st Cir. 2003).

A suit that seeks the initiation of formal consultation under ESA §7 is moot to the extent that such consultation has already been initiated. See Greenpeace Foundation v. Mineta, 122 F. Supp. 2d 1123, 1127-28 (D. Haw. 2000). "[C]ourts should not examine claims that become moot because of changed factual circumstances during the litigation." Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 82 F. Supp. 2d 1070, 1079 (D. Ariz. 2000).

Here, the Navy argues that the consultation it has entered into with NMFS moots Count III, which alleges, among other things, that the Navy is violating Section 7 of the ESA by failing to consult with the NMFS regarding the impact of certain vessel and military operations on listed species of whales. In support of this argument, the Navy submits several exhibits regarding its Section 7 consultation. As indicated earlier, "[w]here [the factual jurisdictional averments in the pleadings] are illuminated, supplemented, or even contradicted by other material in the district court record," the court may consider

such materials.  Aguilar, 510 F.3d at 8.  Thus, while the court must rely on the undisputed facts contained within Strahan's complaint, it must also consider the Navy's submissions that "supplement or even contradict" Strahan's allegations.  Id. Considering all of these materials, the court "should grant [a] motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  Torres-Negron, 504 F.3d at 163.

Here, the Navy has not met its "heavy" burden in attempting to establish mootness because the undisputed material jurisdictional facts concerning Count III do not establish that the Navy's Section 7 consultation addresses the full scope of the Naval operations that constitute the basis of Strahan's complaint.  Manqual, 317 F.3d at 61.  For example, while the complaint refers to "ship operations" including "discharg[ing of] bombs and other explosive/non-explosive ordinance [sic] in marine habitat occupied by populations of Federal Protected Whales" in "U.S. coastal waters," the affidavits and other submissions that address the Navy's consultation with NMFS refer only to certain actions occurring within discrete sections of the United States coastline.  Complaint at 11-12.  The exhibits demonstrate that in January, 2008, the Navy initiated Section 7 formal consultation with the NMFS regarding a "proposed action" involving "Navy

training and testing" in specific "study areas" within three "range complexes" encompassing the coastal region between Norfolk, Virginia and Cape Henlopen, Delaware; the North Carolina coast, and the Florida, Georgia, and South Carolina coastlines.[11] The submissions also indicate that in February, 2009, approximately nine months after Strahan filed his Complaint, the Navy and NMFS exchanged at least one email message regarding the possible expansion of that consultation to include new information regarding Naval "vessel movements," including "unit level training" encompassing "small arms training[] and surface gunnery (inert only)," in transit to and from, as well as within, the three "operating areas [] off the northeastern U.S.," extending "from the U.S./Canadian border in the north to the Delaware Bay in the south."[12]   Finally, the biological opinions issued by NMFS on June 5, 2009, indicate that the Navy completed Section 7 consultation with regard to proposed "training activities" occurring between June 2009 and June 2014 in the three range complexes in the southeastern United States, as well

---

[11]Declaration of Karen Foskey ("Foskey Decl.") and Exh. A to Foskey Decl. ("January 4, 2008 letter").

[12]February 9, 2009 Email from M. Kelly Brock, Ph.D., Acting Natural Resources Team Leader, Chief of Naval Operations, Environmental Resources Division, N45, to Craig Johnson (Exh. B to Motion to Dismiss Memo)("Feb. 9, 2009 Email") and Endangered Species Act Section 7 Consultation Package for U.S. Fleet Forces Activities Conducted off the Northeastern U.S. ("Consultation Package") at ¶¶1, 2.1, 2.2 (appended to Feb. 9, 2009 Email).

as in the "Northeast Operating Area," the parameters of which are not defined in the excerpts submitted to the court.[13]   The scope of the proposed training activities that were the subject of Section 7 consultation is not clear from the June 5, 2009 Biological Opinions, although references to the Navy's mitigation measures suggest that, at least in some of the southeastern range complexes, these activities include "surface-to-surface gunnery" of explosive and non-explosive rounds, "small arms training," "bombing exercises," "missile exercises," and "underwater detonations."[14]

These exhibits suggest that the Navy's recent Section 7 consultation addressed at least some of the actions at issue in Strahan's Complaint.   However, it is not clear from these exhibits that the consultation addressed the full scope of the challenged actions, which encompass Naval operations in or adjacent to Federally Protected Whales' marine habitat along the

---

[13]Programmatic BO at 1.

[14]Id. at 51-55.   In addition, the affidavit of Rear Admiral David F. Baucom indicates that in January, 2009, the Navy completed formal consultation regarding its use of active sonar during training operations in the Atlantic and the Gulf of Mexico. Declaration of Rear Admiral David F. Baucom ("Baucom Decl.") at 5-6 (appended to the PI Opposition).   The Baucom Declaration also indicates that in 1997, 2007, and 2008, the Navy completed formal consultations regarding various training exercises off the southeastern coast of the United States that occurred during those years.   Id. at 8-9.

entire United States coastline.   The actions challenged in Strahan's Complaint are not limited to the Naval training activities that were, as of June 5, 2009, intended to take place in particular areas along the southeastern United States coastline between June, 2009 and June, 2014, and which appear to have been the primary focus of the Navy's recent Section 7 consultation.[15]  See generally, Excerpts from the June 5, 2009 Programmatic and Annual Biological Opinions. Thus, although the exhibits submitted by the Navy suggest that the Section 7 consultations it has engaged in address at least some of the actions at issue in this case, the evidence presented does not demonstrate that Count III is moot.[16]

Accordingly, the Navy's motion to dismiss is being denied. This denial is, however, without prejudice to renewal with regard to mootness after the parties have had an opportunity to confer, to update the record, and to address the court further regarding the issue of mootness.   Strahan's related motion to compel

[15]Because the Navy has not shown that Strahan lacks standing to challenge Naval operations along the entire United States coastline, the court is not addressing that possible objection to the scope of his complaint.

[16]To the extent that Strahan seeks to compel the Navy to enter into Section 7 consultation regarding the 2004 death of a pregnant Northern Right Whale off the Atlantic coast, the June 5, 2009 Programmatic Biological Opinion submitted to the court indicates that such Section 7 consultation has taken place.  See June 5, 2009 Programmatic Biological Opinion at 231.

jurisdictional discovery is being allowed in part and denied in part, without prejudice to renewal if the Navy again moves to dismiss on jurisdictional grounds.

     C. <u>Plaintiff's Amended Motion for a Preliminary Injunction</u>

     Strahan moves for a preliminary injunction against the Navy to "reduce and/or eliminate the likelihood of a navy ship again violating the Section 9 taking prohibitions of the [ESA] by running into a whale whose species is listed as endangered under the Act." Plaintiff's Amended Motion for a Preliminary Injunction ("PI Motion") at 1. Strahan asks the court to impose "restraints for the operating of all Navy ships on the Atlantic coastline with the region of responsibility assigned to NMFS northeast regional office in Gloucester MA." <u>Id.</u> at 2. Specifically, he requests that the court: (1) order all Navy ships to comply with the speed limit restrictions imposed by the NMFS on ships in the northeastern Atlantic when exiting or leaving ports; (2) order the Navy to enter formal Section 7 consultation with the NMFS over a Navy ship's 2004 killing of a pregnant Northern Right Whale; (3) order the Navy, in the absence of such consultation, to apply for a Section 10 incidental take permit regarding the takings of "Large Whales" in the region of responsibility of the NMFS Gloucester office; (4) prohibit Navy ships from operating faster than 10 knots in the Stellwagens Bank

National Marine Sanctuary between June 1st and November 1st each year; (5) order all Navy ships to operate at least 1000 yards away from any sighted "Large Whale"; (6) prohibit Navy ships from operating faster than 10 knots in any Northern Right Whale critical habitat; (7) order all Navy ships to post trained lookouts to look for "Large Whales" when they are navigating within 100 nautical miles of the coastline, and to record the sighting of all "Large Whales" by their crews and provide a copy of said record to Strahan "on a monthly basis for the duration of these proceedings." Id. at 3.

"Under this circuit's formulation, trial courts follow a four-part framework in determining whether the grant or denial of preliminary injunctive relief is appropriate. The district court considers: first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the nonmovant if enjoined compared to the hardship to the movant if the injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest." Water Keeper Alliance, 271 F.3d at 30 (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). Among other things, under the ESA, a party must demonstrate that future irreparable harm is at least likely. See Winter v. Natural Res.

<u>Def. Council</u>, 129 S.Ct. 365, 375 (2008) (holding, in the context of a NEPA suit, that the Ninth Circuit's "possibility" standard for irreparable harm was "too lenient"); <u>Animal Welfare Institute v. Martin</u>, 588 F. Supp. 2d 70, 102 (D. Me. 2008) (employing <u>Winter</u>'s likelihood standard in the context of an ESA suit).

"To carry its burden, a plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings." <u>Palmer v. Braun</u>, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001); <u>see also</u> <u>Davis v. City of Portsmouth, Va.</u>, 579 F. Supp. 1205, 1211 (D.C. Va. 1983) (denying preliminary injunction where plaintiffs did not present any supporting materials beyond the challenged allegations in the pleadings). Moreover, where, as here, the injunction would require an affirmative act by the non-moving party, the "request warrants extra scrutiny." <u>L.L. Bean, Inc. v. Bank of America</u>, 630 F. Supp. 2d 83, 89 (D. Me. 2009). This is because courts "may be more reluctant to grant mandatory injunctions than prohibitory ones." <u>NBA Properties Inc. v. Gold</u>, 895 F.2d 30, 33 (1st Cir. 1990). Thus, a mandatory injunction "should be granted only in those circumstances where the exigencies of the situation demand such relief." <u>Massachusetts Coal. of Citizens With Disabilities v. Civil Def. Agency</u>, 649 F.2d 71, 76 n. 7 (1st Cir. 1981).

Strahan's complaint is verified and is, therefore, the

equivalent of an affidavit.   However, although Strahan states in his motion for preliminary injunction that he "shall supply a memorandum of law with attachments in support of this motion," he has not submitted such a memorandum or supporting evidence. Thus, he has not complied with the requirements of Local Rule 7.1(B)(1).   Nevertheless, because he is <u>pro</u> <u>se</u>, the court has considered his request for a preliminary injunction.

Strahan's motion relies on the verified allegations in his Complaint and on one exhibit addressing the speed limits imposed on vessels "greater than or equal to 65 ft. in overall length" by the National Oceanic and Atmospheric Administration ("NOAA") Fisheries Service.   Compliance Guide for Right Whale Ship Strike Reduction Rule (50 C.F.R. §224.105) (Exh. 1).   In view of the Navy's substantial submissions regarding the extent of its Section 7 consultation with the NMFS, this evidence is insufficient to establish either the required likelihood of success on the merits or the required threat of likely irreparable harm.

In addition, even if Strahan had shown a likelihood of success on the merits and that irreparable injury is likely to result from the challenged Naval operations, this case would be analogous to <u>Winter</u>, in which the Supreme Court held that "any such injury [was] outweighed by the public interest and the

Navy's interest in effective, realistic training of its sailors."
129 S.Ct. at 377.   As in Winter, "[a] proper consideration of
these factors alone requires denial of the requested injunctive
relief."   Id.   Winter was a suit brought by environmental
organizations to enjoin the Navy's use of mid-frequency active
sonar in training exercises in southern California waters,
involved "complex, subtle, and professional decisions as to the
composition, training, equipping, and control of a military
force, which are essentially professional military judgments."
Id. (internal quotation marks omitted).   Explaining that it
"give[s] great deference to the professional judgment of military
authorities concerning the relative importance of a particular
military activity," the Court gave significant weight to the
Navy's submissions reflecting the judgments of Naval authorities
regarding the relative importance of the challenged Naval
operations.   Id. (internal quotation marks omitted).

The reasoning of Winter is applicable to the instant case.
Here, Navy Rear Admiral David F. Baucom asserts, in a sworn
declaration submitted to the court, that the "Plaintiff's demand
for a universal speed limit for all Navy vessel traffic ignores
the fact that ships and submarines need to be able to react to
changing tactical situations in training as they would in actual

31

combat."[17]   Baucom Decl. at 10.   Baucom explains that "[p]lacing arbitrary speed restrictions would not allow [vessels] to properly react to these situations.   [T]raining differently than what would be needed in an actual combat scenario would decrease training effectiveness and [result in] a reduction in crew's abilities."   Id.   Baucom notes that this conclusion echoes that reached by the NMFS in issuing, in 2008, a speed restriction to reduce the threat of ship collision with North Right Whales: that "the national security, navigational and human safety missions of some federal agencies, including the Navy, may be compromised by mandatory vessel speed restrictions."   Id. at 11.   Consequently, Baucom explains, the NMFS exempted United States Navy ships from speed limits for large commercial vessels.   See id.

In addition, Baucom asserts that Strahan's proposed reporting requirements "would detract from the Navy's overall mission."[18]   Id.   He explains that "[t]he Navy's mission is to

---

[17]Strahan does not actually move for a "universal speed limit," but rather to enjoin Navy ships from operating at a speed greater than 10 knots within any Right Whale critical habitat, and to require all Navy ships to comply with NMFS speed limits when exiting or leaving northeastern ports.   PI Motion at 2-3.   This qualification, however, does not diminish the significance of Baucom's reasoned, professional objections to the imposition of the speed limits Strahan seeks.

[18]Baucom slightly mischaracterizes Strahan's requested restraints.   Strahan does not seek an injunction requiring the Navy to record on a computer database the distance and direction from the ship of the sighted whale, along with the speed of the ship at the time of the sighting, and to report any sighting of a

maintain, train, and equip combat-ready naval forces capable of winning wars, deterring aggression, and maintaining freedom of the seas." Id. He also states that:

> The Navy cannot deviate from primary mission objectives to collect sighting information data that is not already required as part of the Biological Opinions issued by NMFS to the Navy through the formal consultation process....Ships, submarines, aircraft, and personnel engaged in training events are intensively employed throughout the duration of an exercise. Their primary duty is accomplishment of the exercise goals, and they should not be burdened with additional duties unrelated to that task. Any additional workload assigned...would adversely impact the effectiveness of the military readiness activity they are undertaking. Thus, the proposed injunctive measures are in conflict with the Navy's operational mission.

Baucom Decl. at 32-33.

In view of the harmful impact that Strahan's requested preliminary injunctive relief would have on critical Naval operations, "the balance of equities and consideration of the overall public interest in this case tip strongly in favor of the Navy." Winter, 129 S.Ct. at 378. Therefore, Strahan's motion

---

whale within 1000 yards of a Navy ship to Strahan and to the court within 48 hours. See Baucom Decl. at 31-32. Rather, he asks the court to require the Navy to "record the sighting of all Large Whales by their crews and provide a copy of the whale sighting records to the plaintiff on a monthly basis for the duration of these proceedings." Plaintiff's Amended Motion for Preliminary Injunction at 3. This mischaracterization does not, however, materially diminish the force of Baucom's conclusion that the imposition of additional reporting requirements would "detract from the Navy's overall mission." Baucom Decl. at 32.

for a preliminary injunction is being denied.

IV. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1.  Plaintiff's motions to lift the stay of this action (Docket Nos. 40 and 50) are ALLOWED.

2.  Plaintiff shall, by December 7, 2010, inform the court of whether he would like the court to seek counsel to represent him, pro bono, in this case.

3.  Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(B)(1) (Docket No. 25) is DENIED without prejudice.

4.  The Navy shall, by December 15, 2010, provide Strahan with the documents it relies upon in asserting that Strahan's claim that it has not engaged in the required Section 7 consultation with the NMFS is moot.  The parties shall confer and, by January 14, 2011, report whether they agree that as a result of the Navy's consultations with the NFMS, Strahan's Section 7 claim is moot.  If not, and the Navy continues to assert that the Section 7 consultation claim is moot, it shall, by February 4, 2011, submit updated evidence concerning its consultation with NMFS and a supplemental memorandum of law. Strahan shall respond by February 18, 2011.

5.   Plaintiff's Motion to Compel Jurisdictional Discovery (Docket No. 41) is ALLOWED to the extent of the discovery ordered in paragraph 4 hereinabove and otherwise DENIED without prejudice.

6.   A hearing on any renewed motion to dismiss Strahan's Section 7 claim and a Scheduling Conference will be held on March 7, 2011, at 3:00 p.m.  The parties shall respond to the attached Order concerning the Scheduling Conference.

7.   Plaintiff's Notice and Motion that the ECF Filing System is Denying Me Access to Case Filings as Part of the District Court's Segregationist Polices [sic] Against Non-Attorney Petitioners (Docket No. 27) is DENIED.

8.   Plaintiff's Amended Motion for a Preliminary Injunction (Docket No. 29) is DENIED.


                              /s/ Mark L. Wolf
                         UNITED STATES DISTRICT JUDGE