UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
RICHARD MAX STRAHAN,            )
        Plaintiff,              )
                               )
        v.                      )        C.A. No. 08-10919-MLW
                               )
ADM. GARY ROUGHEAD, et al.,     )
        Defendants             )
```

MEMORANDUM AND ORDER

WOLF, D.J.                                      December 26, 2012

I. INTRODUCTION

This case involves the United States Navy's obligations to protect four whale species (the "Federally Protected Whales") under the Endangered Species Act (the "ESA"), 16 U.S.C. §1531 et seq. Plaintiff Richard Max Strahan, proceeding pro se, seeks declaratory and injunctive relief against the defendants, Admiral Gary Roughead and Secretary Raymond E. Mabus of the United States Navy, and Leon Panetta, the Secretary of the United States Department of Defense (collectively the "Navy").[1] In essence, plaintiff contends that the Navy is violating provisions of the ESA by: (1) operating its vessels and conducting training operations in United States Atlantic coastal waters in a manner that kills and injures the Federally Protected Whales and adversely alters federally designated critical habitat; and (2) failing to consult with the

---

[1] Panetta is now the Secretary of Defense and is, therefore, automatically substituted for his predecessor, Robert M. Gates, pursuant to Federal Rule of Civil Procedure 25(d).

National Marine Fisheries Service (the "NMFS") regarding the impact of its operations. The Federally Protected Whales are the blue whale (<u>Balaenoptera musculus</u>), the fin whale (<u>Balaenoptera physalus</u>), the humpback whale (<u>Megaptera novaeangliae</u>), and the North Atlantic right whale (<u>Eubalaena glacialis</u>) (the "right whale").[2] <u>See</u> Compl. ¶2; <u>see also</u> 50 C.F.R. §§17.11(h) & 224.101(b) (listing protected species).

In their renewed their motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) (the "Renewed Motion to Dismiss"), defendants essentially contend that plaintiff's claims are moot because the Navy has engaged in the consultation required under the ESA, and has obtained permission from the NMFS to incidentally "take" Federally Protected Whales while conducting its activities. <u>See</u> Defendants' Supp. Mem. of Points and Authorities in Supp. of Mot. to Dismiss (Docket No. 71); Defendants' Mot. to Dismiss For Lack of Subject Matter Jurisdiction (Docket No. 25).[3]

---

[2] The North Atlantic right whale was formerly referred to as the "Northern right whale," and is so referred to in the Complaint. <u>See</u> Compl. ¶2.

[3] The Navy's original Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 25) was denied without prejudice to renewal on November 22, 2010. On July 28, 2011, the Navy filed a Supplemental Memorandum of Points and Authorities in Support of Motion to Dismiss (Docket No. 71). The plaintiff responded to that filing with an Opposition to Defendants' Renewed Motion to Dismiss (Docket No. 76). As the parties agree that the defendants have renewed their motion to dismiss, the court is treating defendants'

At a hearing on March 16, 2012, the court denied plaintiff's oral motions to file a supplemental memorandum in opposition to the Renewed Motion to Dismiss and to file an amended complaint. In a companion Memorandum and Order issued today, the court is denying Plaintiff's Notice of Withdrawal, in which plaintiff seeks to withdraw his Opposition Memorandum and submit a new one. Defendants' Renewed Motion to Dismiss is being decided on the parties' current submissions.

For the reasons described below, defendants' Renewed Motion to Dismiss is being denied because there remain in the present record material disputed facts concerning whether the plaintiff's claims are moot. Therefore, the parties are being ordered to confer and report on a proposed schedule for the remainder of the case.

II. LEGAL STANDARD

The court is addressing a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). One ground for such a motion is mootness. See Valentín v. Hospital Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001).

Under Article III of the Constitution, federal courts do not have jurisdiction "to give opinions upon moot questions." Church of Scientology v. United States, 506 U.S. 9, 12 (1992) (quoting Mills

---

submissions as a Renewed Motion to Dismiss.

v. Green, 159 U. S. 651, 653 (1895)). A case is moot "if the court is not capable of providing any relief which will redress the alleged injury." Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002).[4] "The burden of establishing mootness rests squarely on the party raising it, and '[t]he burden is a heavy one.'" Manqual v. Rotqer-Sabat, 317 F.3d 45, 60 (1st Cir. 2003) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); see also ConnectU LLC v. Zuckerberg, 522 F.3d 82, 88 (1st Cir. 2008).

As plaintiff is proceeding pro se, his pleadings must be liberally construed. See Erickson v. Pardus, 551 U.S. 89, 94 (2007); Hughes v. Rowe, 449 U.S. 5, 9 (1980); Instituto de Educacion Universal Corp. v. United States Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000). However, in deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a court may consider evidence submitted by a defendant in addition to crediting factual allegations made in a complaint. See Aquilar v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec., 510 F.3d 1, 8 (1st Cir. 2007); see also Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).

---

[4] See also Northwest Envtl. Def. Ctr. v. Gordon, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (in appeal of district court dismissal of claims as moot, stating "the basic question in determining mootness is whether there is a present controversy as to which [any] effective relief can be granted").

There are two types of Rule 12(b)(1) challenges, facial and factual. "[W]hen a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) involves factual questions . . . the court must determine whether the relevant facts, which would determine the court's jurisdiction, also implicate elements of the plaintiff's cause of action." Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 162-63 (1st Cir. 2007). "[I]f the facts relevant to the jurisdictional inquiry are not intertwined with the merits of the plaintiff's claim, . . . 'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" Id. at 163 (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). However, "where the jurisdictional issue and substantive claims are so intertwined the resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." Id. (internal quotation and punctuation omitted) (quoting Autery v. United States, 424 F.3d 944, 956 (9th Cir. 2005)). "Thus, where the relevant facts are dispositive of both the 12(b)(1) motion and portions of the merits, the trial court should grant the motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" Id. (internal quotation omitted)

(quoting <u>Trentacosta v. Frontier Pac. Aircraft Indus., Inc.</u>, 813 F.2d 1553, 1558 (9th Cir. 1987)).

In the instant case, defendants make a factual challenge based on mootness. Resolution of the mootness question is dependent on factual matters going to the merits. Therefore, the jurisdictional issue and substantive claims are intertwined. Accordingly, to satisfy their "heavy" burden of showing mootness, <u>Mangual</u>, 317 F.3d at 60, defendants must demonstrate that no material jurisdictional facts are in dispute and that they are entitled to prevail as a matter of law. <u>See</u> <u>Torres-Negrón</u>, 504 F.3d at 163. Moreover, as with a motion for summary judgment, plaintiff is entitled to additional discovery if he can show: "(i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending" motion. <u>Rivera-Torres v. Rey-Hernández</u>, 502 F.3d 7, 10 (1st Cir. 2007) (discussing predecessor to Federal Rule of Civil Procedure 56(d)).

As described below, the court concludes that material facts are in genuine dispute, or may be if plaintiff is afforded additional discovery, and that defendants have not now shown that they are entitled to prevail as a matter of law. Therefore,

defendants have not satisfied their heavy burden, and the Renewed Motion to Dismiss for mootness is not meritorious.

III. BACKGROUND

A. ESA Statutory Framework

The ESA "was enacted in 1973 to prevent the extinction of various fish, wildlife, and plant species." Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv., 340 F.3d 969, 973 (9th Cir. 2003). It authorizes "the Secretary of the Interior to promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'" Bennett v. Spear, 520 U.S. 154, 157-58 (1997) (quoting ESA §4, 16 U.S.C. §1533). Blue, fin, humpback and right whales are all listed species. See 50 C.F.R. §§17.11(h) & 224.101(b). Of these species, only the North Atlantic right whale has designated critical habitat, which is defined as: Cape Cod Bay, Massachusetts; the Great South Channel, which runs between Nantucket Shoals and Georges Bank off Cape Cod, Massachusetts; and the coastal waters of the southeastern United States running roughly between Brunswick, Georgia, and Cape Canaveral, Florida. See 50 C.F.R. §226.203; see also id. §224.105, Figs. 1-3; 59 Fed. Reg. 28,793, 28,806-08 (June 3, 1994). The ESA provides a variety of protections for endangered species once a species is listed or critical habitat is designated.

1. ESA §7

Section 7 of the ESA "directs federal agencies to insure that agency action 'is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.'" Water Keeper Alliance v. U.S. Dep't of Def., 271 F.3d 21, 25 (1st Cir. 2001) (quoting ESA §7(a)(2), 16 U.S.C. §1536(a)(2)). "This substantive requirement is backed up by a scheme of procedural requirements that set up a consultation process" between the federal agency and the overseeing federal service, the NMFS or the United States Fish and Wildlife Service (the "FWS"), "to determine whether endangered species or critical habitat are jeopardized by proposed agency action and whether this adverse impact may be avoided or minimized." Id. (citing ESA §7, 16 U.S.C. §1536).

To determine the possible effects of its actions, the agency -- here, the Navy -- may consult with the relevant service -- here, the NMFS -- through "informal consultation," a term that "simply describes discussions and correspondence between the [NMFS] and the agency designed to assist the agency in determining whether its proposed action is likely to impact listed species or critical habitat." Id. (citing 50 C.F.R. §402.13). "If, at the conclusion of the informal consultation, the [NMFS] issue[s] [a] written concurrence[] that a 'proposed action is not likely to adversely

affect any listed species or critical habitat,' the agency may proceed with the action without further consultation between the parties." Id. (quoting 50 C.F.R. §402.14(b)(1)).

However, where the informal consultation does not resolve the issue, the agency must embark on formal consultation. See id. at 26. "[F]ormal consultation culminates in the [NMFS's] issuance of [a] biological opinion[] advising the agency 'whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat,' and, if so, whether 'reasonable and prudent alternatives' exist to allow the agency to comply with the ESA." Id. (quoting 50 C.F.R. §402.14(h) and citing ESA §7(b)(3)(A), 16 U.S.C. §1536(b)(3)(A)). "If the [NMFS] conclude[s] that the action, or the implementation of any reasonable and prudent alternatives, comply with the ESA, the [NMFS] must also issue an 'incidental take statement' that specifies the amount or extent of the authorized taking of the species." Id. (quoting ESA §7(b)(4), 16 U.S.C. §1536(b)(4) and citing 50 C.F.R. §402.14(i)).

Section 7 consultation generally results in the issuance of either a concurrence letter stating that proposed actions are not likely to jeopardize listed species, or a biological opinion ("BiOp") and an accompanying incidental take statement ("ITS"). A biological opinion and incidental take statement review the effects

9

of proposed actions on listed species, list reasonable and prudent measures to mitigate the effects on the species, and authorize a certain amount of incidental "take" resulting from those actions. See id. at 25-27.

    2. ESA §9

Section 9 of the ESA prohibits any person from "taking" a listed species. See ESA §9(a)(1), 16 U.S.C. §1538(a)(1)(B). The term "person" includes "any officer, employee, agent, department, or instrumentality of the Federal Government." ESA §3(13), 16 U.S.C. §1532(13). The word "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." ESA §3(19), 16 U.S.C. §1532(19). "'Take' is defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93-307, at 7 (1973), reprinted in 1973 U.S.C.C.A.N. 2989, at 2995; see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703-04 (1995) ("Sweet Home") (citing congressional reports demonstrating that "take" is to be defined broadly); Strahan v. Coxe, 127 F.3d 155, 162 (1st Cir. 1997).

The term "harm" is not defined by the ESA. NMFS regulations define "harm" as "an act which actually kills or injures fish or wildlife . . . includ[ing] significant habitat modification or

degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. §222.102; see also Greenpeace Found. v. Mineta, 122 F. Supp. 2d 1123, 1133 (D. Haw. 2000).[5]

Similarly, the term "harass" is not defined by the ESA. The NMFS has not issued regulations defining "harassment," but in its biological opinions, NMFS interprets "harassment" to mean "an intentional or unintentional human act or omission that creates the probability of injury to an individual animal by disrupting one or more behavioral patterns that are essential to the animal's life history or its contribution to the population the animal represents." NMFS Programmatic Biological Opinion on U.S. Navy Training Activities on East Coast Training Ranges ("Programmatic Navy Training BiOp"), Affidavit of David T. MacDuffee ("MacDuffee Affidavit") Ex. A, at 211.[6]

---

[5] FWS regulations define "harm" similarly as meaning "an act which actually kills or injures wildlife [and that] may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. §17.3(c); see also Palila v. Hawaii Dep't of Land & Natural Res., 639 F.2d 495, 497 (9th Cir. 1981).

[6] The NMFS definition of "harassment" derives from the Marine Mammal Protection Act of 1972, which:

defines "harassment" as "any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild or has the

11

As explained earlier, if the NMFS concludes after §7 formal consultation that any taking of a listed species incidental to the agency action will not violate the ESA, the NMFS is required to provide the agency with an incidental take statement specifying the "impact of such incidental taking on the species" and "reasonable and prudent measures . . . necessary or appropriate to minimize such impact." ESA §7(b)(4), 16 U.S.C. §1536(b)(4). "[A]ny taking that is in compliance with the terms and conditions [so] specified . . . shall not be considered to be a prohibited taking of the species" under §9 of the ESA. ESA §7(o)(2), 16 U.S.C. §1536(o)(2).

---

potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering" [16 U.S.C. 1362(18)(A)]. For military readiness activities, this definition of "harassment" has been amended to mean "any act that disrupts or is likely to disturb a marine mammal or marine mammal stock by causing disruption of natural behavioral patterns including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering to a point where such behaviors are abandoned or significantly altered" (Public Law 106-136, 2004).

Programmatic Navy Training BiOp at 211.

The FWS defines harassment similarly as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. §17.3(c); see also Palila, 639 F.2d at 497.

B. Procedural History and Facts

Strahan filed his Complaint pro se under the ESA's citizen suit provision on May 30, 2008, seeking declaratory and injunctive relief that would, among other things, compel the Navy to engage in formal consultation with the NMFS under §7 of the ESA. On May 19, 2009, defendants moved to dismiss for lack of subject matter jurisdiction, arguing, in part, that plaintiff's claims were moot because the Navy had already initiated formal consultation with NMFS regarding its activities. On November 22, 2010, the court denied the motion to dismiss without prejudice to renewal after the parties had an opportunity to conduct limited discovery on the matter of consultation.

Following limited discovery, defendants filed their Renewed Motion to Dismiss and accompanying exhibits. Plaintiff opposed the motion.[7] The following facts are derived from the Complaint and the parties' submissions relating to the Renewed Motion to Dismiss, see Merlonghi, 620 F.3d at 54; Aquilar, 510 F.3d at 8, with certain details reserved for analysis of the issues raised in the Renewed Motion to Dismiss.

---

[7] Plaintiff has also filed several notices or reports since filing his opposition memorandum. See Plaintiff's Report on New Incidents (Docket No. 95); Plaintiff's Notice of Ongoing Proceedings (Docket No. 88). These submissions have not been considered in deciding the Renewed Motion to Dismiss, in part because the Navy has not had the opportunity to respond to them.

13

1. Plaintiff's Complaint

Strahan is a conservation biologist and the Chief Science Officer of Whale Safe USA. See Compl. ¶¶6, 12. He is a frequent and impassioned litigant on behalf of endangered whales. See Strahan v. Diodati, 755 F. Supp. 2d 318 (D. Mass. 2010); Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009); Strahan v. New England Aquarium, 25 Fed. Appx. 7 (1st Cir. 2002); Strahan v. Coxe, 939 F. Supp. 963 (D. Mass. 1996), aff'd in part and vacated in part, 127 F.3d 155 (1st Cir. 1997); Strahan v. Linnon, 967 F. Supp. 581 (D. Mass. 1997), aff'd, 187 F.3d 623 (1st Cir. 1998). As noted earlier, plaintiff filed his Complaint on May 30, 2008.

In the Complaint, plaintiff alleges that the Navy, through the operation of its vessels and its military training operations, routinely causes harm to Federally Protected Whales along the United States Atlantic coast.[8] See Compl. at 1-2, ¶¶3-4, 11, 15, 18-21, 23-25, 27-29, 31-32, 34-36. The primary harms identified by plaintiff include: (1) "ship strikes" of whales by Navy vessels; (2) noises associated with Navy ships and equipment; and (3) discharges of bombs and other ordnance. See id. Plaintiff asserts that these activities "historically," "routinely," and

---

[8] Paragraph 25 of the Complaint refers to the activities and obligations of the "U.S. Coast Guard," not the Navy. For the purposes of this Memorandum and Order, it is presumed that the plaintiff intended this paragraph to refer to the Navy.

"currently" injure, kill or harass Federally Protected Whales. Id. at 1-2, ¶¶3, 19-21, 23-25, 27, 31, 35.

Plaintiff particularly emphasizes the alleged harm to the North Atlantic right whale. See id. at 1-2, ¶¶2-3, 13, 19-23, 29, 31-32, 34-35. The Complaint highlights several instances where plaintiff claims that the Navy has killed right whales, including: the 2005 death of a right whale off Monomoy Island in Massachusetts allegedly resulting from a Navy training operation; the alleged November 17, 2004, Naval ship strike resulting in the death of a pregnant right whale off the Delaware coast; the June 10, 2002, death of a right whale calf who was discovered near an area designated as critical habitat and also near an area where the Navy had conducted bombing exercises off the coast of Cape Cod in Massachusetts; and the death of five right whales in 1996 that were discovered in an area bordering designated critical habitat for the species, and just outside an area where the Navy had been conducting military training exercises with live ordnance. See id. ¶¶3, 19-21, 23. Plaintiff claims that, by these actions, the Navy "has destroyed the ability of the Northern Right Whale to recover from its endangered status." Id. ¶20.

The Complaint alleges three claims against defendants: (1) Count I - violation of ESA §9 for the unlawful "taking" or harming of Federally Protected Whales; (2) Count II - violation of

ESA §9 for the unlawful harming of North Atlantic right whales by adversely altering their designated critical habitat; and (3) Count III - violation of ESA §7(a) for refusing to enter into formal consultation with the NMFS regarding the impact of its vessel and military operations on Federally Protected Whales. See id. ¶¶26-36. Plaintiff asserts that, despite the danger that Naval operations pose to the survival of the Federally Protected Whales, the Navy has: (1) failed to develop a conservation plan to prevent harm to the Federally Protected Whales; (2) refused to record and report on whale injuries and deaths caused by its operations; (3) refused to enter into formal ESA consultation with NMFS; and (4) failed to obtained an incidental take statement from NMFS authorizing the incidental taking of Federally Protected Whales. See id. ¶¶1, 3, 15, 24-36. Plaintiff also alleges that the NMFS has never reviewed the impact of Naval operations on Federally Protected Whales. See id. ¶15, 25.

The Complaint seeks a variety of relief, including: (1) a declaratory judgment that the Navy has violated its duty under ESA §7 to enter into formal consultation with the NMFS regarding its operations, and injunctive relief compelling the Navy to do so; (2) a declaratory judgment that the Navy has violated its duty under ESA §7 to develop and implement a conservation plan to ensure the recovery of Federally Protected Whales; (3) a declaratory

16

judgment that defendants are violating the ESA §9 "take" provisions by harming Federally Protected Whales, and an order enjoining defendants from conducting ship and military operations in a manner that violates this provision; (4) a permanent injunction to enjoin Navy ships from operating and Navy exercises from occurring within 1,000 yards of Federally Protected Whales; and (5) a permanent injunction to prevent Navy ships from traveling in excess of 10 knots within critical habitat of the North Atlantic right whale and within two miles of a sighted or known location of a Federally Protected Whale. See id. ¶¶1, 3-4, I-VII.

### 2. Navy ESA Consultation and Documentation

In response to the November 22, 2010 Order, the parties engaged in limited discovery relating to the Navy's consultation with NMFS. In support of the Renewed Motion to Dismiss, the Navy has produced biological opinions, incidental take statements, and other documents relating to its ESA consultation with the NMFS on various Atlantic coast Naval activities. These thirteen exhibits are attached to the sworn declaration of Navy Natural Resources Manager David T. MacDuffee ("MacDuffee Affidavit") and include: (1) one "programmatic" and three annual NMFS Biological Opinions on U.S. Navy Training Activities on East Coast Training Ranges ("Navy Training BiOps"), see MacDuffee Aff. Exs. A-D; (2) one programmatic and three annual NMFS Biological Opinions on U.S. Navy Atlantic

17

Fleet Active Sonar Training ("Navy AFAST BiOps"), see MacDuffee
Aff. Exs. E-H; (3) a programmatic NMFS Biological Opinion on the
U.S. Navy Undersea Warfare Training Range ("Navy USWTR BiOp"), see
MacDuffee Aff. Ex. K; and (4) an informal consultation concurrence
letter from NMFS regarding the Navy's DDG 51 Class Sea Trials dated
September 12, 2008 ("DDG 51 Class Sea Trials Concurrence Letter"),
see MacDuffee Aff. Ex. L. In addition, the Navy has submitted two
NMFS Final Environmental Impact Statements on measures to reduce
ship strikes to the North Atlantic right whale, see MacDuffee Aff.
Ex. I-J, and a February 2009 Addendum to the August 2008 Biological
Evaluation for East Coast Range Complexes, see MacDuffee Aff.
Ex. M.

The court may properly consider these exhibits for purposes of
deciding the Renewed Motion to Dismiss. See Merlonghi, 620 F.3d at
54; Aguilar, 510 F.3d at 8. Because defendants assertions of
mootness rely on the contents of these documents, they are
summarized in detail.[9]

i. Navy Training BiOps & ITSs

The Programmatic and Annual Navy Training BiOps are the result
of formal ESA §7 consultation with the NMFS initiated by the Navy

_____
[9] Citations in the following sections refer to the page number
of the exhibits, not the documents themselves, as not all of the
documents contain correct pagination.

in 2008. See, e.g., Programmatic Navy Training BiOp at 2.[10] These biological opinions consider vessel operations and training activities in Naval operating areas and "range complexes" along the Atlantic coast of the United States. See id. at 3-42, 73, 128. The Navy Training BiOps conclude that there may be some, but very few, impacts on Federally Protected Whales from these activities.

The "action areas" covered by the Navy Training BiOps include the Northeast Operating Areas, comprised of the Boston Complex Operating Area, the Narragansett Bay Operating Area, and the Atlantic City Operating Area; the Virginia Capes Range Complex; the Cherry Point Range Complex, off the coast of North Carolina; and the Jacksonville Range Complex, which includes both the Charleston and Jacksonville Operating Areas and runs from North Carolina to Florida. See id. at 2, 4, 9, 17, 24, 31-35, 40, 73, 128.

The proposed actions considered in the Navy Training BiOps primarily involve individual unit and joint training exercises for

---

[10] Similar information is included in the Programmatic and Annual Navy Training BiOps except where so noted. See generally 2009 Annual Navy Training BiOp; 2010 Annual Navy Training BiOp; 2011 Annual Navy Training BiOp.

The Programmatic Navy Training BiOp was issued on June 5, 2009, and covers the years between June 2009 and June 2014. See Programmatic Navy Training BiOp at 1-4. The three Annual Navy Training BiOps were issued in June 2009, June 2010, and June 2011, and cover Navy operations for the year following those dates. See 2009 Annual Navy Training BiOp at 1-3; 2010 Annual Navy Training BiOp at 3-6; 2011 Annual Navy Training BiOp at 3-6.

various types of Naval combat operations. See id. at 3-42.[11] The BiOps consider the potential impacts of these Naval activities on the Federally Protected Whales and several other listed species. See id. at 129-193. They also discuss mitigation and protective measures to be implemented by the Navy, including: special training for Navy personnel; posting of lookouts on Navy ships; reporting, monitoring and tracking whale locations; utilizing special operating procedures and collision avoidance strategies, including vessel speed restrictions and safety zones around known whales; and taking additional protective measures in and around North Atlantic right whale habitat. See id. at 43-66. In addition, they discuss monitoring and reporting requirements, including: notifying NMFS when activities are thought to have resulted in the injury, death, or unauthorized take of a marine mammal, or if an injured or dead mammal is found in the vicinity of certain Naval training exercises; creating an Integrated Comprehensive Monitoring Program Plan; and submitting both comprehensive (i.e., five-year) and annual monitoring and exercise reports for the Virginia Capes,

---

[11] The Navy Training BiOps also discuss activities related to the Navy's Atlantic Fleet Active Sonar Training ("AFAST") as "Interrelated and Interdependent Actions." See, e.g., Programmatic Navy Training BiOp at 71-112, 219-228, 243-248, 258-319. AFAST actions, however, are the subject of separate ESA §7 consultation resulting in the Navy AFAST BiOps.

Cherry Point, and Jacksonville Range Complexes. See id. at 66-70.[12]

The Navy Training BiOps identify a variety of potential "stressors" for Federally Protected Whales stemming from Naval training activities, including: ship collisions; disturbances due to movement of vessels and aircraft; exposure to shock and sound waves from underwater detonations; interactions with unexpended ordnance; and exposure to chemicals from explosive charges and ordnance. See id. at 212-219. Based on estimates of the amount and types of operations, the total number of Navy ships operating on the Atlantic coast, and the total number of hours at sea (or "steaming days") for the Atlantic fleet, the Navy Training BiOps estimate that there may be some, but very few, impacts on Federally Protected Whales. See id. at 213-219, 228-243, 248-257, 296-319.

In particular, the Navy Training BiOps calculate that based on an estimated 3,450 steaming days per year, "Navy vessels would have a 0.0000472 probability of striking a whale in any year over the next five years or a probability of 0.000236 over the five-year period." Id. at 231. Three of the Navy Training BiOps do not calculate specific numbers of whales that may be at risk of being struck by Navy vessels, but the 2010 and 2011 Annual Navy Training BiOps estimate these numbers at zero blue whales, two fin whales,

---

[12] See also 2009 Annual Navy Training BiOp at 42-69; 2010 Annual Navy Training BiOp at 43-67; 2011 Annual Navy Training BiOp at 47-78.

53 humpback whales, and one right whale per year. See 2010 Annual Navy Training BiOp at 248-254; 2011 Annual Navy Training BiOp at 291-296. The Navy Training BiOps also estimate that, annually, just two fin whales and two humpback whales are at risk of being exposed to underwater detonations, and only in the Virginia Capes Range Complex. See, e.g., Programmatic Navy Training BiOp at 238, 298. No other Federally Protected Whales are estimated to be at risk from underwater explosions in any Atlantic coast operating area. In addition, the Navy Training BiOps discuss, but do not calculate specific exposures for vessel and aircraft disturbances, chemicals, and unexploded ordnance. See id. at 243-245.

Each of the Annual Navy Training BiOps also includes an incidental take statement. See, e.g., 2009 Annual Navy Training BiOp at 318-320.[13] Each ITS permits two "harassments" of both humpback and fin whales in the Virginia Capes Range Complex relating to underwater detonations, but no other harassments or "harm" to any Federally Protected Whale along the Atlantic coast, including for ship strikes. See id. at 328-319. Each ITS notes that "[n]o whales are likely to die or be wounded as a result of their exposure to U.S. Navy training activities in the Northeast Operating Area, Virgina Capes Range Complex, Cherry Point Range

---

[13] The other Navy Training BiOps contain essentially the same Incidental Take Statement. See 2010 Annual Navy Training BiOp at 288-290; 2011 Annual Navy Training BiOp at 333-336.

Complex, or Jacksonville Range Complex." Id. at 319.

The incidental take statements require the Navy to submit various reports on its actions, and recommend that the Navy work with the NMFS to conduct a cumulative impact analysis of its activities on marine mammals. See id. at 319-320. The ITS for the 2011 Annual Navy Training BiOp specifically provides that "to be exempt from the prohibitions of section 9 of the Endangered Species Act" the Navy shall provide annual monitoring reports and annual military exercise reports for the Virginia Capes, Cherry Point, and Jacksonville Range Complexes. 2011 Annual Navy Training BiOp at 335.

Reinitiation of formal consultation is required if: "(1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion." Id. at 336.

ii. AFAST BiOps and ITSs

Like the Navy Training BiOps, the Programmatic and Annual Navy AFAST BiOps are the result of formal ESA §7 consultation with the NMFS initiated by the Navy in 2008. See, e.g., Programmatic Navy

AFAST BiOp at 3.[14] The Navy AFAST BiOps consider Atlantic Fleet Active Sonar Training ("AFAST") activities occurring along the Atlantic coast of the United States from the Boston Complex Operating Area in the Gulf of Maine, to the Jacksonville-Charleston Operating Areas, and further south to approximately 23 degrees north latitude, which is south of the southern tip of Florida. See id. at 3-4, 14-15, 59. The Navy AFAST BiOps conclude that significant numbers of Federally Protected Whales are likely to be harassed, but not harmed, by Navy AFAST activities. See id. at 144-146, 180-183, 190-195, 205.

The proposed activities considered in the Navy AFAST BiOps involve individual unit and group exercises for various types of combat and sonar-related operations, and include training with mid-frequency and high-frequency active sonar, as well as the Navy's extended echo ranging systems. See id. at 4-16. The AFAST BiOps discuss mitigation and protective measures to be implemented by the

---

[14] In essence, the same information is included in the programmatic and annual Navy Training BiOps with minor variations except where so noted. See generally 2009 Annual Navy AFAST BiOp; 2010 Annual Navy AFAST BiOp; 2010 Annual Navy AFAST BiOp.

The Programmatic Navy AFAST BiOp was issued on January 16, 2009, and covers the years between January 2009 and January 2014. See Programmatic Navy AFAST BiOp at 1-4. The three Annual Navy Training BiOps were issued in January 2009, January 2010, and January 2011, and cover Navy operations for one year from those dates. See 2009 Annual Navy AFAST BiOp at 1-4; 2010 Annual Navy AFAST BiOp at 1-3; 2011 Annual Navy AFAST BiOp at 1, 5-6.

Navy, including: special training for Navy personnel; posting of lookouts on Navy ships; reporting, monitoring and tracking whale locations; creating safety zones and decreasing sonar decibel levels where animals are detected; avoiding exercises in designated Planning Awareness Areas that contain high concentrations of marine mammals; utilizing special operating procedures and collision avoidance strategies, including vessel speed restrictions; taking additional protective measures such as speed restrictions and exercise limitations in and around North Atlantic right whale critical habitat and migration, calving, and feeding areas; creating an Integrated Comprehensive Monitoring Program Plan; submitting annual AFAST Monitoring Plan and AFAST Exercise Reports; and submitting an AFAST 5-Year Comprehensive Report in November of 2012. See id. at 16-41.

The Navy AFAST BiOps identify a variety of potential "stressors" for Federally Protected Whales stemming from AFAST activities, including: ship collisions; disturbances due to vessel proximity; harms from high and mid-frequency active sonar sound waves; harms from explosive charges in certain sonar devices; and entanglements with parachutes from sonobuoy deployments. See id. at 49, 132-141. Based on estimates of the amounts and types of activities described, the Navy AFAST BiOps anticipate a variety of possible impacts on Federally Protected Whales, primarily stemming

from exposure to active sonar sound waves. See id. at 131-202. The Programmatic and Annual Navy AFAST BiOps vary somewhat in their estimates of annual whale exposures to active sonar, but fall within the following ranges: 800-881 blue whales; 880-970 fin whales; 4,172-4,622 humpback whales; and 662-733 right whales. See id. at 144-146, 180-183, 190-195.[15] The Navy AFAST BiOps do not calculate specific estimated exposures for ship collisions, disturbances due to vessels and aircraft, explosive charges, or sonobuoy parachutes, but instead discuss mitigation measures and likely animal responses. See id. at 132-136, 140-142, 148-152, 190-196.

Each of the Annual Navy AFAST BiOps also includes an incidental take statement. See, e.g., 2009 Annual Navy AFAST BiOp at 204-209.[16] The incidental take statements permit, in essence, the following numbers of annual harassments due to active sonar: 880 blue whale harassments; 970 fin whale harassments; 4,620 humpback whale harassments; and 730 right whale harassments. See id. at 205.[17] There are no other permitted harassments or harms for any Federally Protected Whales, including for ship strikes, although

---

[15] See also 2010 Annual Navy AFAST BiOp at 146-147, 184-187, 194-200; 2011 Annual Navy AFAST BiOp at 137-139, 170-172, 177-182.

[16] See also 2010 Annual Navy AFAST BiOp at 208-212; 2011 Annual Navy AFAST BiOp at 188-192.

[17] See also 2010 Annual Navy AFAST BiOp at 208-209; 2011 Annual Navy AFAST BiOp at 188-189.

each ITS notes that the NMFS "generally expect[s]" that blue, fin, and humpback whales will "change their behavior in response to cues from [Navy] vessels." Id.[18] Each ITS also states that "[n]o whales would die or be wounded as a result of their exposure to U.S. Navy active sonar training activities along the Atlantic Coast." Id.

The incidental take statements also require the Navy to submit various reports on its actions to NMFS, and recommend that the Navy work with the NMFS to conduct a cumulative impact analysis of its activities on marine mammals. See id. at 206-208. Each ITS specifically provides that "to be exempt from the prohibitions of section 9 of the Endangered Species Act" the Navy shall submit: an Annual Atlantic Fleet Active Sonar Training Report, which contains, among other things, a Cumulative Impact Report, and information on AFAST training exercises, sonar usage, and mammal sightings; and individual reports following the completion of major sonar exercises. Id. at 206-208.

Reinitiation of formal consultation is required if: "(1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not

---

[18] The right whale is omitted from this paragraph in all three incidental take statements. See 2009 Annual Navy AFAST BiOp at 205; 2010 Annual Navy AFAST BiOp at 209; 2011 Annual Navy AFAST BiOp at 189.

considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion." Id. at 209.

#### iv. Navy USWTR BiOp

The Programmatic USWTR BiOp was issued on July 28, 2009, and resulted from formal ESA consultation initiated in 2004 on the Navy's proposed installation and use of its Undersea Warfare Training Range ("USWTR") in the Jacksonville Range Complex off the coast of Florida. See Programmatic Navy USWTR BiOp at 1, 3-4.

The USTWR project comprises two phases: installation, scheduled to begin in 2012 or 2013, which involves the placing of a network of devices and undersea cables about 50 nautical miles off the Florida Coast; and operations, scheduled to begin in 2014 or 2015, when anti-submarine warfare training will be conducted in the area. See id. at 3-8, 22. The Programmatic USWTR BiOp concludes that the installation phase is "not likely to adversely affect endangered or threatened species under NMFS' jurisdiction" or their critical habitat, but that activities during the operations phase will likely adversely affect some Federally Protected Whales. Id. at 1, 3-7, 193-196, 199. Identified potential stressors in the installation phase include risk of collisions with vessels involved in placing the USWTR equipment, disturbances from those vessels, alteration of habitat, and potential entanglements with cables. See

id. at 114-116. Mitigation measures for the installation phase involve lookouts on all installation vessels, and suspension of installation activities during North Atlantic right whale calving season. See id. at 16. Stressors, potential impacts and mitigation procedures for the operations phases are also identified.

The BiOp does not include an ITS that provides for any "take" of Federally Protected Whales, and requires reinitiation of formal consultation when the operations phase begins or if: "(1) endangered or threatened marine animals are 'taken' incidental to the installation of the training range; (2) new information reveals effects of the installation of the training range that may affect listed species or critical habitat in a manner or to an extent not previously considered in this biological opinion; [or] (3) the installation of the training range is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this biological opinion." Id. at 1-2, 200-201.

iv. DDG 51 Class Sea Trials Concurrence Letter

The DDG 51 Class Sea Trials Concurrence Letter is an informal consultation concurrence letter written by NMFS regarding the Navy's proposed sea trials for the new DDG 51 Class guided missile destroyers between 2008 and 2011. See DDG 51 Class Sea Trials Concurrence Letter. It covers a variety of testing activities and

29

maneuvers for the destroyers occurring in the Gulf of Maine, the Great South Channel, and waters south of Georges Bank. See id. at 1-3. The concurrence letter notes that the Navy's proposed mitigation measures include: conducting full power runs only during daylight; utilizing trained observers and lookouts; using sighting advisory system reports for protected marine mammals; limiting speeds or using traffic separation schemes to avoid collisions; and implementing extra precautions if whales are known to be in the area. See id. at 2-3. The letter states that the only anticipated effects of the sea trials are "ship strikes or other direct interaction with exercise components (e.g., released [inert] ordnance)." Id. at 3. The letter concludes that the Navy's proposed activities are "not likely to adversely affect any species under NMFS jurisdiction" and that "no further consultation pursuant to section 7 of the ESA is required." Id. at 4.

IV. ANALYSIS

In the Renewed Motion to Dismiss, defendants contend that plaintiff's claims are moot because the Navy has initiated ESA §7 formal consultation for all activities challenged in the Complaint, and because it has been issued incidental take statements for those activities, which provide an "absolute defense" to claims under §9 of the ESA. As explained earlier, a case is moot "if the court is not capable of providing any relief which will redress the alleged

injury." <u>Gulf of Maine Fishermen's Alliance</u>, 292 F.3d at 88 (citation omitted). "Thus, 'if an event occurs while a case is pending . . . that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the [action] must be dismissed.'" <u>Id.</u> (quoting <u>Church of Scientology</u>, 506 U.S. at 12); <u>see also</u> <u>New Engl. Reg'l Council of Carpenters v. Kinton</u>, 284 F.3d 9, 17-19 (1st Cir. 2002). The party asserting mootness bears a heavy burden in attempting to establish its applicability. <u>Connectu</u>, 522 F.3d at 88; <u>Manqual</u>, 317 F.3d at 60. In the instant case, the Renewed Motion to Dismiss may be granted only if the material jurisdictional facts are not in dispute and defendants show they are entitled to prevail as a matter of law. <u>See</u> <u>Torres-Negrón</u>, 504 F.3d at 163.

   A. <u>Count I - Violation of ESA §9 for Harming Federally Protected Whales</u>

   Count I of plaintiff's Complaint asserts that defendants are violating §9 of the ESA by killing, injuring and unlawfully taking Federally Protected Whales in the course of the Navy's vessel operations and training activities. Defendants contend that this claim is moot because the Navy has been issued incidental take statements for these activities, and that these ITSs constitute an "absolute defense" to claims under ESA §9.

   Although the First Circuit has not decided the issue, other

courts have held that while an incidental take statement may moot §9 claims and shield an agency from §9 liability, it does so only if the ITS and its accompanying biological opinion address the agency's actions, and the agency complies with the conditions and take limits established by the ITS. See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1108 (9th Cir. 2012); Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1034-35 (9th Cir. 2007); Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1239 (9th Cir. 2001); In re Operation of Missouri River Sys. Litig., 363 F. Supp. 2d 1145, 1160 (D. Minn. 2004) ("Missouri River"), aff'd in part and vacated in part, 421 F.3d 618 (8th Cir. 2005).

The ESA provides that any taking in compliance with an ITS "shall not be considered to be a prohibited taking" of the species. ESA §7(o)(2), 16 U.S.C. §1536(o)(2). The Ninth Circuit has stated that an ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions." Ctr. for Biological Diversity, 698 F.3d at 1108 (emphasis added) (quoting Arizona Cattle Growers, 273 F.3d at 1239); see also Oregon Natural Res. Council, 476 F.3d at 1034-35; Missouri River, 363 F. Supp. 2d at 1160 (a federal agency has an "absolute defense to a Section 9

claim so long as its operations are in accordance with the [biological opinion] and the terms and conditions of the ITS").

However, the Ninth Circuit has also noted that "if the terms and conditions of the Incidental Take Statement are disregarded and a taking does occur, the action agency or the applicant may be subject to potentially severe civil and criminal penalties under Section 9." Arizona Cattle Growers, 273 F.3d at 1239; see also Bennett, 520 U.S. at 170. For example, ESA regulations require a federal agency, in accordance with its ITS, to monitor and report on the impacts of its incidental take, and to reinitiate consultation if the amount or extent of incidental take permitted in the ITS is exceeded. See 50 C.F.R. §402.14(i)(3)-(4); Ctr. for Biological Diversity, 698 F.3d at 1108. "When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." Ctr. for Biological Diversity, 698 F.3d at 1108 (citing Allen, 476 F.3d at 1037); see also Arizona Cattle Growers, 273 F.3d at 1249 (each ITS "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation").

That §9 liability is only narrowly circumscribed by biological

opinions and incidental take statements is reflected in the relevant caselaw. For example, in <u>Mt. Graham Red Squirrel v. Espy</u>, the Ninth Circuit concluded that there was no §9 liability for deaths of protected squirrels during a trapping and tagging program authorized by the United States Forest Service because a biological opinion addressed the relevant actions, and because the squirrel deaths did not exceed the limits in the incidental take statement. <u>See</u> 986 F.2d 1568, 1580 (9th Cir. 1993). Similarly, in <u>Oregon Wild v. Connor</u>, the United States District Court for the District of Oregon determined that §9 claims were moot, but only because a biological opinion and incidental take statement had been issued covering all challenged actions impacting endangered salmon, and the agency was acting in compliance with the terms and conditions of the incidental take statement. <u>See</u> No. 6:09-CV-00185-AA, 2012 WL 3756327, at *1-*3 (D. Or. Aug. 27, 2012). Likewise, in <u>Strahan v. Linnon</u>, a judge of this Court determined, on a motion for summary judgment, that declaratory and injunctive relief under §9 were not warranted where United States Coast Guard admitted it had previously taken endangered whales and implemented measures in a newly promulgated biological opinion to protect whales in the future. <u>See</u> 967 F. Supp. at 599-602 (Woodlock, J.).[19]

---

[19] <u>Cf.</u> <u>Oregon Natural Desert Ass'n v. Tidwell</u>, 716 F. Supp. 2d 982, 1005 (D. Or. 2010) (in case involving United States Forest Service grazing permits, noting that exceedance of take limits in

In the instant case, the Navy has submitted its Annual Navy Training and Navy AFAST BiOps, each of which contains an ITS authorizing incidental take of Federally Protected Whales. However, defendants have submitted no evidence concerning whether they are acting in compliance with these biological opinions or their associated incidental take statements. For example, the Navy has not submitted any of the range complex monitoring and exercise reports that it is required to submit to NMFS pursuant to its Navy Training BiOps. The Navy also has not provided any of the AFAST reports or individual exercise reports required by the Navy AFAST BiOps. As the incidental take statements attached to these biological opinions state, such reports must be submitted to NMFS for the Navy "to be exempt from the prohibitions of section 9 of the Endangered Species Act." 2011 Annual Navy Training BiOp at 335; see also 2011 Annual Navy AFAST Biop at 189-191; 2010 Annual Navy AFAST Biop at 209-211; 2009 Annual Navy AFAST Biop at 206-208.

Moreover, when liberally construed because it was filed by

---

Forest Service's ITS would invalidate the safe harbor provision and subject the agency to §9 liability, but that "plaintiffs must still demonstrate that take has occurred"); S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv., 629 F. Supp. 2d 1123, 1131-34 (E.D. Cal. 2009) (discussing citizen suits and §9 liability for violating ITSs and causing take); Ctr. for Marine Conservation v. Brown, 917 F. Supp. 1128 (S.D. Tex. 1996) (determining that takings in excess of ITS limits were not prohibited takings under ESA §§7 and 9 provided that the agency was otherwise acting within the terms and conditions of the incidental take statement).

plaintiff _pro_ _se_, the Complaint contains factual allegations asserting, in essence, that the Navy is not acting in compliance with the terms of its incidental take statements. See Merlonghi, 620 F.3d at 54; Aguilar, 510 F.3d at 8. For example, the Complaint states that defendants have failed to record and report on injuries to Federally Protected Whales. See Compl. §§19, 24. The Complaint also asserts that Navy vessels and training operations routinely injure, kill, and harass Federally Protected Whales by ship strikes, disturbances associated with Navy ships and equipment, and discharges of bombs and other ordnance. See id. at 1-2, ¶¶3-4, 15, 18-21, 23-25, 27-29, 31-32, 34-36. The Navy has not submitted any evidence to the contrary. Nor has it submitted any reports regarding the actual impact of its operations on Federally Protected Whales.

None of the Navy's incidental take statements authorize takes stemming from ship strikes or vessel traffic. None authorize any incidental whale deaths. The only authorized takes are sonar-related harassments, and two annual underwater detonation harassments for both humpback and fin whales in the Virginia Capes Range Complex. The Complaint, therefore, in essence alleges that unauthorized incidental takes are occurring and there is, at present, no evidence to refute these contentions. Such allegations, if proved, would require reinitiation of consultation, would render

the Navy's relevant biological opinions and ITSs invalid, and would deprive the Navy of §9 immunity for such takes. See Ctr. for Biological Diversity, 698 F.3d at 1108; Arizona Cattle Growers, 273 F.3d at 1249.

Moreover, as discussed in more detail below, it remains unclear, based on the evidence before the court, whether the Navy's biological opinions and incidental take statements cover all of the Navy's actions along the Atlantic coast. Any takings resulting from its activities that were not addressed in the biological opinions would also be subject to §9 liability.

Accordingly, because there are material jurisdictional facts in dispute and defendants have not shown that they are entitled to prevail as a matter of law. See Torres-Negrón, 504 F.3d at 163. The court concludes, therefore, that defendants have not satisfied their heavy burden to show that plaintiff's ESA §9 claim in Count I is moot. See Manqual, 317 F.3d at 60.

   B. Count II - Violation of ESA §9 for Harming the North Atlantic Right Whale by Adversely Altering Critical Habitat

Count II of the Complaint alleges that defendants are harming the North Atlantic right whale by adversely altering its designated critical habitat and, therefore, violating the take provision of §9 of the ESA. In their original motion to dismiss, defendants contended that this claim was moot because there can be no "take"

of designated critical habitat. In the Renewed Motion to Dismiss, they contend that Count II is merely a subset of the harms articulated in Count I, and is likewise moot.

Defendants have not shown that they are entitled to judgment as a matter of law because degradation of critical habitat may, in fact, lead to violations of ESA §9. As explained earlier, ESA §9 makes it unlawful to "take" any listed species. See ESA §9(a)(1)(B), 16 U.S.C. §1538(a)(1)(B). The term "'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." ESA §3(19), 16 U.S.C. §1532(19). The NMFS has defined "harm" as an act "includ[ing] significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, [sic] breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. §222.102; see also Sweet Home, 515 U.S. at 690-708 (upholding FWS regulation 50 C.F.R. §17.3 that included "habitat modification" in the definition of "harm"). The NMFS also interprets "harassment" as meaning "an intentional or unintentional human act or omission that creates the probability of injury to an individual animal by disrupting one or more behavioral patterns that are essential to the animal's life history or its contribution to the population the animal represents." Programmatic Navy Training BiOp at 211. Therefore, modification or degradation of the

North Atlantic right whale's designated critical habitat may lead to unlawful takes of North Atlantic right whales under ESA §9. See Greenpeace Found. v. Mineta, 122 F. Supp. 2d at 1133-34; Greenpeace Found. v. Daley, 122 F. Supp. 2d 1110, 1121 (D. Haw. 2000); see also Sweet Home, 515 U.S. at 690-708.

In addition, the Complaint, liberally construed, alleges ongoing degradation of designated critical habitat for the North Atlantic right whale causing injury or harm to that whale population. See Compl. at 1-2, ¶¶13, 31. For the purposes of the Renewed Motion to Dismiss, in the absence of any evidence to the contrary, these allegations are being credited as true. See Merlonghi, 620 F.3d at 54; Aguilar, 510 F.3d at 8.

In view of the foregoing, the court concludes that there are material jurisdictional facts in dispute and that defendants have not shown that they are entitled to prevail as a matter of law concerning Count II of the Complaint. See Torres-Negrón, 504 F.3d at 163. In addition, even if the court were to assume that plaintiff's designated critical habitat claim is a subset of plaintiff's other §9 claim, for the reasons discussed earlier these claims are not moot. Accordingly, the court finds that defendants have not satisfied their heavy burden to show plaintiff's ESA §9 claim in Count II is moot. See Manqual, 317 F.3d at 60.

C. Count III - Violation of ESA §7

Count III of the Complaint alleges that the Navy violated its obligations under §7 of the ESA by failing to enter into consultation with the NMFS concerning the impact of its vessel and military operations on Federally Protected Whales. Defendants contend that this claim is moot because the Navy has entered into formal consultation regarding its activities, and the court can no longer grant the declaratory and injunctive relief plaintiff seeks.

As noted previously, §7 of the ESA contains both substantive and procedural protections for listed species. Substantively, it requires federal agencies to "insure that agency action 'is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.'" Water Keeper Alliance, 271 F.3d at 25 (quoting ESA §7(a)(2), 16 U.S.C. §1536(a)(2)); see also Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy, 898 F.2d 1410, 1414-15 (9th Cir. 1990) ("Pyramid Lake"). Procedurally, §7 establishes the methods of informal and formal consultation "to determine whether endangered species or critical habitat are jeopardized by proposed agency action and whether this adverse impact may be avoided or minimized." Water Keeper Alliance, 271 F.3d at 25 (citing ESA §7, 16 U.S.C. §1536); see also Pyramid Lake, 898 F.2d at 1414-15. The court considers first the procedural

and then the substantive issues relating to whether plaintiff's §7 claim is moot.

### 1. Procedural Obligations

The Navy contends that it has engaged in both informal and formal consultation on its Atlantic coast activities that may impact Federally Protected Whales, rendering plaintiff's §7 claim moot. These activities include the Navy's training and AFAST operations, installation of its Undersea Warfare Training Range, and the Navy's DDG 51 Class Sea Trials. The Navy contends that these four consultations address the Navy's ongoing military readiness activities involving vessel speeds over 10 knots in action areas covering the entire length of the Atlantic coast. See MacDuffee Aff. ¶¶3-8.

Section 7 claims seeking declaratory relief and injunctive relief such as court ordered consultation are moot if the desired consultation has already occurred, even where it was initiated after the lawsuit was filed. See Forest Guardians v. Johanns, 450 F.3d 455, 461-63 (9th Cir. 2006); Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 765 (8th Cir. 2004); S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727-30 (10th Cir. 1997).[20] However,

---

[20] See also Defenders of Wildlife v. Jackson, 791 F. Supp. 2d 96, 108-14 (D.D.C. 2011); Oregon Natural Desert Ass'n, 716 F. Supp. 2d at 994-95; Oceana, Inc. v. Evans, C.A. No. 03-10570-GAO, 2004 WL 1730340, at *3-*4 (D. Mass. July 30, 2004); Greenpeace Found. v. Mineta, 122 F. Supp. 2d at 1127-29; Sw. Ctr.

such claims are not moot where the consultation does not encompass the entire range of challenged activities, where a continuing practice is at issue that involves ongoing violations of the ESA, where future injunctive relief may be available, or where declaratory relief would serve some other valid purpose. For example, in Forest Guardians v. Johanns, the Ninth Circuit concluded that plaintiff's ESA claims seeking reinitiation of consultation were not rendered moot by reinitiation having already occurred because a declaratory judgment that the United States Forest Service had violated the ESA by failing to comply with monitoring requirements would help remedy the effects of the agency's violations and ensure that similar violations would not occur in the future. See 450 F.3d at 462-63; see also Oregon Natural Desert Ass'n, 716 F. Supp. 2d at 994-95 (concluding that reinitiation of formal consultation did not moot ESA §7 claim of failure to consult where declaratory and future injunctive relief remained available). Similarly, in Greenpeace Foundation v. Mineta, the court determined that although reinitiation of consultation had mooted two ESA claims, plaintiff could still challenge the adequacy of current biological opinions, and could seek judicial oversight of the agency's actions and implementation plans. See 122

_____

for Biological Diversity v. U.S. Forest Serv., 82 F. Supp. 2d 1070, 1079 (D. Ariz. 2000); Lone Rock Timber Co. v. U.S. Dep't of Interior, 842 F. Supp. 433, 438-39 (D. Or. 1994).

F. Supp. 2d at 1127-29; see also Defenders of Wildlife, 791
F. Supp. 2d at 108-14 (concluding that although reinitiation of
formal consultation mooted certain ESA claims relating to failure
to consult, the court could still provide injunctive relief by
enjoining certain agency actions until formal consultation was
completed).

In the instant case, the Navy has engaged in significant and
meaningful consultation with the NMFS regarding its operations. As
described earlier, the Navy has engaged in §7 consultation on its
training and AFAST operations, its Undersea Warfare Training Range,
and its DDG 51 Class Sea Trials, resulting in associated biological
opinions, incidental take statements, and concurrence letter.[21]
These documents contain extensive analyses of the impacts of these
Naval actions on the Federally Protected Whales. The biological
opinions and incidental take statements require a variety of
mitigation and protective measures for Federally Protected Whales,
including special operating procedures and vessel speed
restrictions, as well as monitoring and reporting of both whale and
Naval activities. They also provide for specific protections for

---

[21] See Defenders of Wildlife v. U.S. Dep't of Navy, --- F.
Supp. 2d ----, 2012 WL 3886412, at *24 (S.D. Ga. Sep. 6, 2012)
(determining at summary judgment that Navy had complied with
consultation obligations under ESA on its installation of the
Undersea Water Training Range, including with regard to North
Atlantic right whale).

the North Atlantic right whale and its designated critical habitat. Such conditions are similar, but not identical, to the forms of relief sought by the plaintiff, which include vessel speed restrictions and safety radii from known whales. In addition, the geographic range of the activities considered in these consultations encompasses virtually all of the Atlantic coast of the United States, including the entirety of the designated critical habitat of the North Atlantic right whale.[22]

---

[22] The Navy Training BiOps cover training actions in waters in and adjacent to: the Northeast Operating Areas, which run from the Canadian border to Delaware Bay; the Virginia Capes Range Complex, which extends from Delaware to North Carolina; the Cherry Point Range Complex, which is off the coast of North Carolina; and the Jacksonville Range Complex, which runs from approximately Camp Lejeune in North Carolina to Daytona Beach, Florida. See Programmatic Navy Training BiOp at 2, 4, 9, 17, 24, 31-35, 40, 73, 128. These operating areas and range complexes extend east off the Atlantic coastline more than 50 nautical miles. See id. at 9, 24, 35, 73. Similarly, the Navy AFAST BiOps cover activities occurring along the Atlantic coast of the United States from waters within and adjacent to the Boston Complex Operating Area in the Gulf of Maine, to the Jacksonville-Charleston Operating Areas, and further south to approximately 23 degrees north latitude, which is south of the southern tip of Florida. See Programmatic Navy AFAST BiOp at 3-4, 14-15, 59. The AFAST action areas extend east from the Atlantic coastline to 45 degrees west longitude, which is approximately perpendicular to the southern tip of Greenland. See id. at 14. In addition, the Programmatic USWTR BiOp covers the Navy's proposed installation of its Undersea Warfare Training Range in the Jacksonville Range Complex off the coast of Florida. See Programmatic Navy USWTR BiOp at 1, 3-4. The DDG 51 Class Sea Trials Concurrence Letter also covers testing occurring in the Gulf of Maine, the Great South Channel, and waters south of Georges Bank. See DDG 51 Class Sea Trials Concurrence Letter at 1-3.

The action areas for these Navy consultations include the entirety of the designated critical habitat for the North Atlantic

Nevertheless, the Navy has not provided evidence that proves that these consultations encompass the full scope of its activities along the Atlantic coast. Therefore, material jurisdictional facts remain in dispute. See Torres-Negrón, 504 F.3d at 163. For example, the Navy contends that its consultations, in particular the Navy Training BiOps, consider the impact of ordinary Naval vessel traffic in addition to training operations on Federally Protected Whales, such as transits to and from ports along the Atlantic coast. See, e.g., 2011 Navy Training BiOp at 141-144, 282-288 (discussing mitigation measures relating to Atlantic coast port transits and right whales); February 2009 Addendum to the August 2008 Biological Evaluation for East Coast Range Complexes at 8-11 (discussing vessel transits in East Coast ports). However, although such ship traffic is discussed in portions of the Navy Training BiOps, the parts of these BiOps that estimate the possibility of ship strikes to Federally Protected Whales due to Navy operations do not take such ship traffic into account. See, e.g., 2011 Navy Training BiOp at 262 (in estimating the total number of "steaming days" at sea for its proposed actions, noting that "[v]essel movements unrelated to training activities — for example, for storm

---

right whale, which is Cape Cod Bay, Massachusetts; the Great South Channel, which runs between Nantucket Shoals and Georges Bank east and south of Cape Cod, Massachusetts; and the coastal waters of the southeastern United States between Brunswick, Georgia, and Cape Canaveral, Florida. 50 C.F.R. §203 & §224.105, Figs. 1-3.

evasion, deployment transits, and movements in basins to rearrange ships for repairs, berthing, loading, and off-loading from designated piers — would increase these estimates.").[23] These data form the basis for the conclusions in each Navy Training BiOp and ITS that the Navy's actions are likely to adversely affect, but are not likely to jeopardize the continued existence of, the Federally Protected Whales. The court concludes, therefore, that the Navy has not satisfied its burden to show that there are no material jurisdictional facts in dispute because the Navy has not demonstrated that its consultation encompasses all Naval ship movements along the Atlantic coast. See Torres-Negrón, 504 F.3d at 163.

In addition, there may still be meaningful relief available to the plaintiff. The Complaint alleges that defendants continue to harm Federally Protected Whales by ship strikes. In the absence of any conflicting evidence, the court must credit these allegations as true for the purposes of the Renewed Motion to Dismiss. See Merlonghi, 620 F.3d at 54; Aguilar, 510 F.3d at 8. These factual

---

[23] See also February 2009 Addendum to the August 2008 Biological Evaluation for East Coast Range Complexes at 8 (providing data on estimated steaming days per year for training operations and noting that "non-training related vessel movements could occur and are unpredictable as to their occurrence in a year, such as, but not limited to, storm evasion, deployment transits, and movements in the basin to rearrange for repairs[,] berthing[,] loading[, and] off-loading from designated piers").

46

allegations, if proved, may justify declaratory relief that would ultimately lead to, at a minimum, reinitiation of consultation. Similarly, the Complaint seeks injunctive relief that would prohibit the Navy from operating its ships within 1,000 yards of Federally Protected Whales and from traveling over 10 knots within two miles of a sighted or known location of a Federally Protected Whale. Compl. ¶¶1, 3-4, I-VII. Although the Navy's biological opinions and incidental take statements contain protective measures that include both safety radii from known whales and vessel speed restrictions, the protective measures in those documents are not as broad as those sought by the plaintiff. See, e.g., Programmatic Navy Training BiOp at 48, 60, 235 (providing that Navy ships should attempt to keep at least 500 yards away from known whales, subject to ship safety). Accordingly, the court concludes that, depending on the merits of his claims, there may be meaningful relief available to the plaintiff. See Forest Guardians, 450 F.3d at 462-63; Oregon Natural Desert Ass'n, 716 F. Supp. 2d at 994-95.

The facts that the biological opinions do not definitively address the entire range of the challenged Naval activities and that there may be meaningful relief available to the plaintiff reinforce the conclusion that there are material jurisdictional facts in dispute and that defendants have not showed that they are entitled to prevail as a matter of law. See Torres-Negrón, 504 F.3d

at 163. The court finds, therefore, that defendants have not satisfied their heavy burden to show plaintiff's §7 claim is moot. See Manqual, 317 F.3d at 60; see also Gulf of Maine Fishermen's Alliance, 292 F.3d at 88; Forest Guardians, 450 F.3d at 462-63; Northwest Envtl. Def. Ctr., 849 F.2d at 1244-45.

2. Substantive Obligations

Even if the court were to conclude that defendants had satisfied their procedural duties, they would still be required to satisfy their substantive §7 obligations because a "federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species" merely by relying on a biological opinion. Pyramid Lake, 898 F.2d at 1415. Reliance on a biological opinion that is legally flawed or that fails to consider information that would undercut the opinion's conclusions violates the substantive duties imposed by ESA §7. See Ctr. for Biological Diversity, 698 F.3d at 1128; Wild Fish Conservancy v. Salazar, 628 F.3d 513, 532 (9th Cir. 2010).

The Navy Training BiOps calculate the future likelihood of ship strikes based on the number of known Navy ship strikes over a 60-year period and the estimated number of steaming days over that period, while conceding that estimates of the number of steaming days are "almost certainly incorrect." Programmatic Navy Training

48

BiOp at 230-231.[24] As discussed earlier, these data do not contain estimates for non-training vessel movements such as storm evasions, deployment transits, or repairs, which the Training BiOps recognize "would increase these estimates" if included. Id. at 213, 229-30. Similarly, the Navy AFAST BiOps do not attempt to calculate the likelihood of ship strikes due to AFAST activities, but instead conclude that the "probability of a collision seem[s] fairly small given the [mitigation and protective] measures that are in place." Programmatic Navy AFAST BiOps at 132-33, 142. Based on the evidence provided by defendants, the court cannot determine whether the Navy has satisfied its substantive obligations under §7 of the ESA by relying on these biological opinions.

Moreover, the Complaint contains specific factual allegations about recent harms to right whales that are not directly addressed in the relevant biological opinions. See Compl. ¶¶3, 19-21, 23. If

---

[24] For purposes of these calculations, the Navy Training BiOps assume that the number of annual steaming days between 2006 and 2007 are representative of the annual number of steaming days between 1945 and 2009, but note that "this assumption is almost certainly incorrect" and that the data on actual steaming days are not available. Programmatic Navy Training BiOp at 231. Notably, the Navy Training BiOps estimate that the likelihood of its vessels not striking a whale is 99.99% in any given year and 99.97% over a five year period, but elsewhere note that there have been at least seven confirmed ship strikes of whales by Navy vessels along the Atlantic coast in the past 60 years. See id. at 230-231. The Navy Training BiOps also state that they "do not have the information necessary" to estimate the probability of a ship strike using the "most relevant" methodology identified in the biological opinion. Id. at 230.

proven, these allegations would undercut the Navy's biological opinions and incidental take statements. In the absence of other evidence to the contrary, these allegations must be credited as true for the purposes of the Renewed Motion to Dismiss. See Merlonghi, 620 F.3d at 54; Aquilar, 510 F.3d at 8. Therefore, the court concludes that defendants have not satisfied their heavy burden to show that plaintiff's ESA §7 claims are moot. See Manqual, 317 F.3d at 60; see also Torres-Negrón, 504 F.3d at 162.

V. CONCLUSION

In view of the foregoing, the court concludes that defendants have not proven that plaintiff's claims are moot because there are material jurisdictional facts in dispute and defendants have not demonstrated that they are entitled to prevail as a matter of law. See Torres-Negrón, 504 F.3d at 163. The court further finds that additional discovery is necessary to address not only the merits of plaintiff's claims but the issues identified in this Memorandum and Order concerning mootness. Cf. Rivera-Torres, 502 F.3d at 10 (at summary judgment, additional discovery appropriate where party can show good cause, a plausible basis for believing that additional facts exist and can be retrieved within a reasonable time, and an explanation of how those facts may defeat the pending motion).

Accordingly, it is hereby ORDERED that:

1. Defendants' Renewed Motion to Dismiss is DENIED.

2. By February 15, 2013, the parties shall confer and report, jointly if possible but separately if necessary, on a plan and schedule necessary to complete discovery on both the issue of mootness and the merits of the case.

3. A Scheduling Conference shall be held on February 28, 2013, at 3:30 p.m. Representatives of the parties with full settlement authority shall attend.

4. After discovery is complete, in consultation with the parties, the court will decide whether to establish a schedule for motions for summary judgment or whether to proceed directly to trial.

_____/s/ Mark L. Wolf_____<br>
UNITED STATES DISTRICT JUDGE